**STATE of Utah, Plaintiff and Appellee,**

v.

**James Dean CLASSON and Daniel E. Classon, Defendants and Appellants.**

No. 930186–CA.

Court of Appeals of Utah.

March 6, 1997.

Margaret P. Lindsay, Provo, and Linda Anderson, Salt Lake City, for Defendants and Appellants.

Jan Graham and Thomas B. Brunker, Salt Lake City, for Plaintiff and Appellee.

Before WILKINS, BILLINGS and JACKSON, JJ.

WILKINS, Associate Presiding Judge:

Defendants James Dean Classon and Daniel E. Classon appeal their 1992 convictions for aggravated sexual assault, a first degree felony. *See* Utah Code Ann. § 76–5–405 (1995). We reverse and remand for a new trial because we hold defendants were denied their Sixth Amendment right to receive effective assistance of counsel.

## BACKGROUND

### I. The Crime

Because defendants are appealing from a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, *see* State v. Dunn, 850 P.2d 1201, 1205 (Utah 1993), and recite the facts accordingly. However, we also present conflicting evidence to the extent necessary to clarify the issues raised on appeal. *See id.* at 1204–05; State v. Vigil, 922 P.2d 15, 18 (Utah.Ct.App.1996).

Around midnight on June 16, 1992, sixteen-year-old A.B. was walking near a park in Provo, Utah. Two and one-half days earlier, A.B. had run away from a group home. During that time, she had slept in a park and had eaten only an apple. Defendants, who were age twenty-six and twenty-eight, one married and one unmarried, saw A.B. as they were driving down the street. James thought A.B. was a prostitute, and Daniel asked her if she wanted a ride. A.B. accepted the invitation and got into the back seat of the two-door car, which Daniel was driving.

Defendants were drinking beer and offered some to A.B., which she accepted and drank. A.B. testified she drank the beer because defendants threatened to kill her if she did not get drunk. Defendants testified A.B. willingly accepted the beer. Defendants and A.B. agree that she drank the beer very fast, and that defendants told A.B. they were going "to party" in the mountains.

Defendants then drove to a convenience store to buy more beer. A.B. testified that after Daniel gave James money to buy the beer, she tried to leave the car by the passenger door. When she did, Daniel told her to get back in the car, and James, who had just left the store and returned to the car, pushed her back into the car and threatened to kill her if she tried to leave. Defendants, however, testified that, while James was buying the beer, A.B. remained in the car with Daniel, whom she talked to, "rubbed," and kissed. Daniel testified that in kissing him, A.B. gave him a hickey on his neck.

After leaving the convenience store, Daniel drove into the mountains. During the drive, defendants gave A.B. four or five more beers to drink. A.B. testified defendants told her "they wanted to have fun with [her]." However, defendants testified the three of them were listening to music, drinking beer, and having a good time together.

On a dirt road in Hobble Creek Canyon, one of the car's tires became flat, so Daniel pulled to the side of the road. A.B. testified they pulled to the left side of the road to change the front left tire. Defendants testified they pulled to the right side of the road to change the back right tire. There were no street lights, street signs, traffic, or houses where Daniel stopped. A.B. did not know where defendants had taken her. Daniel admitted that he purposely drove to this remote area because it was unlikely police would be there. Defendants and A.B. then got out of the car, and James changed the tire.

A.B.'s and defendants' testimonies varied significantly at this point. A.B. testified that while James changed the tire, Daniel forced her to undress and have sexual intercourse with him against her will. A.B. unsuccessfully tried to stop him by biting him on the

neck. A.B. testified that after Daniel had finished, and after James had changed the tire, James also forced her to have sexual intercourse with him.

A.B. testified that after James finished, she tried to run away, but Daniel forced her back into the car where he again forced her to have sexual relations with him. Daniel told her that if she said anything he would kill her. After Daniel finished, she got out of the car to put her clothes on, but James threw her to the ground and forced himself upon her again.

A.B. testified that after the rapes, defendants started apologizing to her and arguing between themselves as to whose fault it was. They then told her to get in the car and drove her to Springville, where they gave her five dollars and dropped her off. Defendants offered to pay for A.B. to stay in a hotel room, but failed to follow through when she accepted their offer. Just before they left, defendants again threatened A.B., stating that if she told anyone they had raped her, they would kill her.

Defendants, on the other hand, both testified that after Daniel changed the tire, the three got back in the car, drove a little further up the road, then parked and continued drinking beer and listening to music. Defendants testified that A.B. was kissing and fondling Daniel, so James took a couple of beers with him and left the car for approximately twenty minutes. Daniel testified that after James left, he had consensual sexual intercourse with A.B. in the back seat.

Both defendants testified that when James returned to the car, A.B. began kissing James, so Daniel grabbed some beer and left the car for about twenty minutes. James testified that while Daniel was absent, he had consensual sexual intercourse with A.B. inside the car.

Defendants testified that afterwards, the three drove to Springville, where A.B. asked to be dropped off. When A.B. left the car, Daniel gave her $25.00. James offered her his coat, but she refused it. A.B. also refused Daniel's offer to pay for a motel room for her so she could shower and relax.

After defendants drove away, A.B. called 911 and said she had been raped. A sheriff's deputy arrived and took A.B. to a hospital.

A.B. arrived at the hospital around 3:00 a.m., where she received a Code "R" examination, an examination designed specifically for rape victims. The examination revealed physical evidence of recent sexual intercourse and motile sperm. In addition, "H" antigens were discovered, which are consistent with Type "O" blood. Later, it was discovered that defendants have Type "O" blood, while A.B. has Type "A" blood.

After A.B. was taken to the hospital, a detective from the sheriff's office, acting upon A.B.'s description of defendants and their car, found defendants.

## II. Defendants' Legal Representation

Both defendants were arrested and charged with two counts of aggravated sexual assault, a first degree felony. *See* Utah Code Ann. § 76-5-405 (1995). The court appointed attorneys from Legal Defenders, Inc. to represent defendants. From the time they were charged to the time they were convicted, defendants had contact with three attorneys from Legal Defenders: John Musselman, Cleve Hatch, and Joe Alldrege. Musselman was an experienced criminal lawyer. Hatch had tried several misdemeanor cases, but only one felony case at the most. Alldrege had just been hired by Legal Defenders and, as far as Hatch knew, had no trial experience.

At their waiver hearing, defendants met with Musselman and Hatch. During this meeting, Musselman encouraged defendants to accept a plea bargain, which they refused. James later testified that at this meeting, Musselman told defendants that he would represent them. Daniel testified that after he and James refused the plea bargain offer, Musselman said that he would begin working on the case and that Hatch would represent one brother and Musselman would represent the other. Daniel also testified that because Musselman did not have enough time to talk to them that morning, he said he would "come down to the county jail and talk to [defendants] and get a little more information" later. Musselman, however, testified

that he would not have unequivocally agreed to represent defendants because he was uncertain at that point whether he would be available to represent them at trial.

Later, Musselman represented defendants at their arraignment in July 1992.[1] Daniel later testified that at the arraignment, Musselman advised defendants to waive their right to a speedy trial to give him time to prepare a solid defense. Musselman later testified that he was merely "standing in" for Hatch at the arraignment. However, Daniel testified that Musselman told defendants at the arraignment that he would represent one brother and Hatch would assist him and represent the other brother. Daniel stated that the "sole reason" he waived his right to a speedy trial was because Musselman said that he had experience in criminal law, that he would represent defendants, and that he needed more time to prepare the case.

Defendants both claim they spoke on the phone with Musselman while they were incarcerated. James asserted that while he was at the county jail, he called Musselman. During the conversation, Musselman reaffirmed he was their trial attorney and stated he would try to visit them. Daniel testified that when he spoke with Musselman over the phone, he expressed his concern that Musselman had not yet come to the county jail to talk to them. Musselman told him that either he or Hatch would come to see them and that he was "very busy" working on their case and would see them at trial. Musselman did not remember these conversations, but acknowledged he may have talked to defendants by phone.

Hatch represented defendants at their preliminary hearing in July 1992, which Alldrege also attended. Daniel later testified that he told the court "in a pretrial" that he did not want Hatch to represent him.

Hatch also represented defendants at the advanced trial management hearing, which was held a couple of weeks before trial in September 1992. Within the first five sentences of that hearing, at which defendants were present, the court and Hatch voiced

their joint understanding that Musselman was representing one defendant and Hatch was representing the other, and that both Musselman and Hatch would represent defendants at trial.

In addition, James complained during the trial management hearing that he believed the public defenders office's work load precluded their attorneys from adequately preparing defendants' cases. James stated:

> I understand that we have public defenders. I understand that they are well, well overloaded with cases. Therefore we will go ahead and take one [public defender] and the other one would like to have a private attorney if possible. The only reason why is so that they will have adequate time to at least build a halfway descent [sic] case for us.

The prosecutor informed the court that a conflict would exist if defendants planned to take inconsistent positions. The court stated that it could discern no conflict from the file, but would appoint separate counsel if defendants established a conflict. James responded, "[M]ay you please note that down that we did ask for another attorney, conflict of interest." Hatch then stated,

> Your Honor, for the record, in the times I have visited them at the Prelim and so forth, neither one has told me that there is anything different about their stories. They said that they are standing together on it and weren't willing to testify against each other. If that has changed, we will certainly let the court know.

James agreed, stating, "That hasn't changed at all. We are not going to testify against one another." The court then instructed Hatch to discuss with defendants whether a conflict existed.

The prosecutor told Hatch at the trial management hearing that A.B.'s mother was a possible State witness. Soon after, the prosecutor telephoned Hatch to tell him A.B.'s mother was a possible defense witness because she had potentially exculpatory evidence. A.B.'s mother, Ms. B., had told the

---

1. The minute entries filed in July 1992 regarding defendants' arraignments list Musselman as "co-

counsel."

prosecutor that A.B. had "a history of fabricating physical complaints in order to gain attention." Two of these previous complaints involved rape and sexual assault. Hatch then included Ms. B.'s name on the defendants' declaration of witnesses filed with the court, accompanied with the short notation, "Ms. [B.] will also testify that [A.B.] is not reporting accurate information." The State also included Ms. B. as a rebuttal witness on its first witness list filed with the court.

Two days before trial, Hatch also represented both defendants in a deposition proceeding.

Hatch later testified that, based on at least one conversation with Musselman, he understood that at trial he would represent one of the defendants and Musselman would represent the other. Hatch understood that Musselman, who was an experienced trial attorney, would act as lead counsel at trial, including taking charge of cross-examining A.B., and that Hatch would assist him. However, Musselman testified that he did not tell Hatch that he would act as lead counsel, or that he would definitely attend the trial. Instead, Musselman testified that his office had assigned Hatch and Alldrege to represent defendants. Musselman stated that he occasionally answered Hatch's questions about defendants' case, but asserted that he never unequivocally agreed to represent defendants because he was uncertain if he would be able to attend their trial.

Due to his expectation that Musselman would appear at trial, Hatch did not prepare as fully as he may have otherwise. In addition, James later testified that Hatch told defendants Musselman was their attorney and Hatch would only assist.

On the first day of trial, Musselman did not appear. Defendants both expressed to Hatch their concern about Hatch's lack of criminal trial experience, but Hatch reassured them that Musselman was coming. During jury selection, the court and the prosecutor acknowledged that defendants did not each have an attorney present, but addressed that problem by allowing Hatch to strike two potential jurors each time the prosecutor struck one. Although the objection is not found in the trial transcript, James testified

at the Rule 23B hearing that when he realized the trial was starting without Musselman, he stood up and asked the trial court to postpone the trial because defendants' attorney was not present. James testified that the trial court said, "Well, Mr. Hatch is here." In response, James explained that "Mr. Hatch is not our attorney. Mr. Musselman is. Hatch is assisting." James testified he and Daniel made several objections to continuing the trial without Musselman, but the court overruled them each time.

Before opening arguments, in the midst of jury selection, Hatch told the trial court that photographs of defendants, taken by a detective, were missing. Specifically, Hatch expressed his concern that a picture of Daniel's neck showing what Daniel alleged to be a hickey, and what A.B. alleged to be a bite, was missing. The prosecutor explained that the pictures were unavailable because they were lost in June 1992 when the detectives moved to a new sheriff's office. Therefore, it would be impossible for Hatch to introduce them into evidence.

The following witnesses for the prosecution testified on the first day of trial: A.B.; Dr. Gad, the emergency room doctor who examined A.B.; and Dr. Murdock, the serologist at the state crime lab who tested both A.B.'s Code "R" kit sent from Dr. Gad and the blood samples taken from defendants.

Although A.B. identified defendants as the two men who raped her, she was unable to identify which defendant was James and which was Daniel. When Hatch later testified at the Rule 23B hearing, he said that what most bothered him about his performance at trial was his cross-examination of A.B. Hatch testified that he had planned on Musselman conducting the cross-examination, so Hatch was not prepared. Hatch read over the transcript of the preliminary hearing one time before trial, but did not mark it up in any way to prepare for cross-examination. Hatch testified, "[F]rankly, I don't think I was well prepared to conduct [A.B.'s cross-examination].... That's the part that I feel like a less than good job was done."

Musselman also did not appear on the second day of trial, and defendants again objected to continuing the trial without him. The court asked Alldrege, who had been sitting in the audience observing the trial, to come sit at counsel table with defendants. The court then overruled defendants' objection, ruling that because Hatch and Alldrege were in court, defendants were adequately represented.

Later, defendants both testified that they did not have an attorney-client relationship with Alldrege. Defendants asserted that Alldrege instructed them not to ask him any questions, and that Hatch told them that Alldrege was not their attorney. Hatch later testified that Alldrege was at trial only to observe and was not involved in planning trial strategy. Alldrege's only involvement in the case was to unsuccessfully try to ask A.B. one question on cross-examination at the preliminary hearing, to suggest Hatch ask one question during the trial, and to otherwise simply sit and observe the proceedings.

The following witnesses testified during the second day of trial: Deputy Bell, the deputy sheriff who responded to A.B.'s 911 call and took her to the hospital; Officer Taylor, the police detective who found defendants based on A.B.'s description of them and their car, and who watched officers arrest defendants; Detective Carter, who executed the search warrant of defendants' car; both defendants; Kimberly Daughtery, who, with her husband, ran the group home A.B. lived in before she ran away; and Dr. Brinton, an expert witness who essentially testified that A.B.'s injuries could have been caused by consensual intercourse. Portions of the deposition of the nurse who assisted with A.B.'s Code "R" examination were also read into evidence.

During the trial, Hatch unsuccessfully attempted to introduce testimony regarding A.B.'s previous complaints of sexual assault and rape which, according to her mother's statement to the prosecutor, A.B. later recanted. For example, during cross-examination, Hatch twice sought to question A.B. about these complaints, but both times the court sustained the State's objection.

The jury found each defendant guilty of one count of aggravated sexual assault, and not guilty of the other count. The court sentenced each defendant to serve ten years to life in prison, and to pay half of the victim's expenses caused by the offense.

In January 1993, the trial court denied defendants' motion for a new trial. Defendants then initiated this appeal.

Defendants' first brief was filed by Hatch in August 1993. In November 1993, Hatch filed a motion to remand, pursuant to Rule 23B of the Utah Rules of Appellate Procedure, which this court denied.

In January 1994, Hatch filed a motion to withdraw, accompanied by a motion to remand to supplement the record. In April 1994, this court granted the motion to withdraw, but denied the motion to supplement the record. The district court then appointed new appellate counsel for defendants pursuant to this court's order.

Defendants' new counsel filed a motion to remand to create a record of errors. This court denied the motion, but ordered, sua sponte, a Rule 23B remand to take evidence regarding the following two issues: (1) whether defendants' counsel failed to advise defendants that they would be entitled to separate defense counsel; and (2) whether Musselman improperly failed to appear at trial and whether Hatch failed to provide defendants with effective assistance of counsel due to inadequate pretrial investigation and trial preparation.

Defendants' counsel was again replaced in January 1995 by a third attorney, who represented defendants at the Rule 23B evidentiary hearing. Hatch, Musselman, and both defendants were called to testify. In November 1995, the trial court entered findings and conclusions based on the Rule 23B hearing. Among its findings, the court found that Musselman never unequivocally agreed to represent defendants at trial, that several deficiencies existed in Hatch's pretrial preparation, that Hatch and defendants had indicated to the trial court that their defenses did not conflict, and that defendants did not indicate to the trial court any desire to sever the trial. The court concluded that Mussel-

man did not improperly fail to appear at trial, that Hatch's pretrial preparation, although deficient, did not deny defendants of their right to effective assistance of counsel, and that defendants were advised they were entitled to separate defense counsel.

In January 1996, Margaret Lindsay filed an appearance of counsel with this court on behalf of James, and James's former attorney withdrew. Also in January, this court granted defendants' motion to strike the briefs previously filed in this case. In March 1996, new counsel for Daniel replaced the attorney who represented him at the Rule 23B hearing.

Defendants filed a new Rule 23B motion to remand on the issue of ineffective assistance of counsel relating to Musselman's failure to appear at trial and Hatch's failure to inform or prepare defendants for the presentation of testimony at trial. Attached to this motion were affidavits, including an affidavit from Alldrege. This court denied defendants' motion.

In October 1996, Daniel's counsel withdrew and was replaced by new counsel. This new counsel withdrew in October 1996, and was replaced by Linda Anderson in December 1996. Ms. Anderson then participated in filing defendants' reply brief and appeared before us at oral arguments.

## ANALYSIS

Defendants make the following arguments on appeal: (1) the trial court committed plain error when it instructed the jury regarding "aiding and abetting," the aggravator element the State relied on in prosecuting defendants for aggravated sexual assault; (2) the evidence was insufficient to establish that defendants aided and abetted each other; and (3) defendants were deprived of their Sixth Amendment right to receive effective assistance of counsel. To support their ineffective assistance claim, defendants argue: (A) their counsel's performance was so deficient that it prejudiced their defense, and (B) the trial court failed to properly address defendants' contention that a conflict of interest existed.

Because we conclude defendants were denied effective assistance of counsel because no lawyer took responsibility to represent them, we do not reach the other issues raised on appeal.

### A. Standard of Review

The trial court ruled on the defendants' ineffective assistance of counsel claim at the Rule 23B hearing. Therefore, defendants' ineffective assistance claim on appeal presents us with a mixed question of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *State v. Snyder*, 860 P.2d 351, 354 (Utah.Ct.App.1993). Accordingly, we defer to the trial court's findings of fact, but review its legal conclusions for correctness. *See State v. Perry*, 899 P.2d 1232, 1238 (Utah.Ct. App.1995); *see generally State v. Pena*, 869 P.2d 932, 935–36 (Utah 1994).

### B. The Right to Effective Assistance of Counsel

Under the Sixth Amendment, "[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair." *Strickland*, 466 U.S. at 685, 104 S.Ct. at 2063. This constitutionally protected right to counsel "is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970).

#### 1. Inadequate Representation

A defendant can be deprived of the right to effective assistance of counsel by a lawyer who simply fails "to render 'adequate legal assistance.'" *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980)). Generally, to successfully claim ineffective assistance of counsel, a defendant must satisfy a two-part test established by the Supreme Court in *Strickland* and recognized by the Utah Supreme Court in *State v. Lairby*, 699 P.2d 1187 (Utah 1984). Under this test, a defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *See*

*Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Lairby,* 699 P.2d at 1203–04.

First, to show counsel's performance was deficient, a defendant must establish that counsel's representation fell below an objective standard of reasonableness, or, in other words, that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064. To establish these serious errors occurred, a defendant must identify counsel's specific acts or omissions that "fall outside the wide range of professionally competent assistance." *State v. Frame,* 723 P.2d 401, 405 (Utah 1986); *see also Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. In doing so, a defendant must overcome our presumption that, when viewing the circumstances of the case as of the time of counsel's conduct, counsel's challenged action or omission was sound trial strategy. *See id.* at 689, 104 S.Ct. at 2065.

Second, to show prejudice, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. Under this prong of the test, the defendant must show that a "reasonable probability" exists that the trial result would have been different if counsel had not erred. *Id.* at 694, 104 S.Ct. at 2068; *Frame,* 723 P.2d at 405. "A reasonable probability is a probability sufficient to undermine confidence in the reliability of the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *Lairby,* 699 P.2d at 1205–06.

Defendants raise two arguments that may satisfy the two-prong *Strickland* test. First, they assert Hatch failed to investigate the possible testimony of A.B.'s mother to the effect that A.B. had made similar claims of sexual assault in the past and had later recanted the claims. Second, defendants claim that they were not adequately prepared to testify on their own behalf.[2] However, even if we were to accept each of these claims as adequate to satisfy the first prong of *Strick-*

*land,* defendants still fail to meet the second prong, since there is no proof by a reasonable probability that the trial outcome would have been more favorable.

First, with respect to the possible testimony of A.B.'s mother that A.B. had made sexual assault claims in the past and then recanted them, Hatch attempted to elicit similar testimony from other knowledgeable witnesses regarding A.B.'s prior claims and recantation. That evidence was not admitted by the trial court, and no issue regarding the evidentiary ruling was preserved on appeal. As such, even if Hatch had investigated A.B.'s mother and her testimony had been as asserted by defendants, there is no indication that Hatch would have been any more successful in getting that information before the jury than he was with the other witnesses regarding the same facts. As a result, the failure to pursue the possible testimony of A.B.'s mother does not result in a reasonable probability of a different outcome for the defendants at trial. *See Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068 (requiring defendant show reasonable probability of different trial outcome).

Second, with respect to their own testimony, defendants fail to demonstrate any probability at all of a different outcome had they been more adequately prepared. The record reveals that defendants testified both consistently with their version of events and consistently with each other. They admit sexual relations with A.B., but allege A.B. consented. The jury did not believe them. Defendants have failed to present any other possible testimony they may have been able to give, had they been better prepared to testify, that would have materially altered their version of the facts. Because the jury did not believe defendants' version of the facts, there is no reasonable probability of a different outcome. *See id.* (same). We thus conclude defendants have failed to show they were denied effective assistance of counsel under the *Strickland* test.

2. We have considered defendants' other claims of ineffective assistance, such as Hatch's failures to submit an appropriate jury instruction of a lesser included offense, to carefully scrutinize the police reports before trial, and to adequately cross-examine A.B. However, we conclude these claims are not substantial enough to require us to analyze them under *Strickland.*

### 2. Fundamental Fairness

■ However, our conclusion that the *Strickland* test was not met does not end our analysis of whether defendants were denied effective assistance of counsel. Although a defendant may show that he or she was denied effective assistance of counsel by satisfying both prongs of the *Strickland* test, the Supreme Court has emphasized that the principles set out in *Strickland* "do not establish mechanical rules," *id.* at 696, 104 S.Ct. at 2069. Instead, these principles "are guides to the ultimate focus upon the fundamental fairness of the proceeding challenged," *Frame,* 723 P.2d at 405; *accord Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, because "[t]he purpose of the inquiry is simply to insure that defendant receives a fair trial," *Frame,* 723 P.2d at 405; *see also Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (purpose of effective assistance guarantee is "to ensure that criminal defendants receive a fair trial"). The Supreme Court has emphasized that the fairness of a proceeding is challenged by a claim of ineffective assistance of counsel because "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland,* 466 U.S. at 685, 104 S.Ct. at 2063 (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 275, 276, 63 S.Ct. 236, 240, 87 L.Ed. 268 (1942)). Therefore, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064.

■ Courts have discussed many examples of attorney conduct that may undermine the proper functioning of the adversarial process. For example, in conjunction with its discussion of what constitutes ineffective assistance of counsel, the Supreme Court in *Strickland* listed a variety of duties belonging to counsel which, if not adhered to, may result in ineffective assistance. The Court noted an attorney is required to: advocate the defendant's cause, avoid conflicts of interest, "consult with the defendant on important decisions[,] and keep the defendant informed of important developments in the course of the prosecution." *Id.* at 688, 104 S.Ct. at 2065. Failure to investigate is also a form of attorney conduct that may undermine the adversarial process. *See State v. Templin,* 805 P.2d 182, 188 (Utah 1990). Moreover, some conduct, such as various kinds of state interference with counsel's assistance and active representation of conflicting interests, is so egregious that it is presumed to result in prejudice to defendant's defense. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067.

■ Attorney conduct, such as that itemized above, is the focus of the *Strickland* test. However, the *Strickland* test also presumes that an attorney was involved in the case who accepted responsibility for the defense of the defendant who is now claiming ineffective assistance. As the Court in *Strickland* noted:

> That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough .... The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.

*Id.* at 685, 104 S.Ct. at 2063 (emphasis added). Therefore, it is not enough that a defendant have a lawyer present at trial. To actually have a legal counselor, a defendant must enjoy the benefit of receiving counsel from an attorney who accepts responsibility for the defendant's representation. *See Kryger v. Turner,* 25 Utah 2d 214, 218, 479 P.2d 477, 480 (1971) ("[T]he right of an accused to have counsel is not satisfied by a sham or pretense of an appearance in the record by an attorney who manifests no real concern about the interests of the accused."); *see also Alires v. Turner,* 22 Utah 2d 118, 121, 449 P.2d 241, 243 (1969). "The accused is entitled to the assistance of a competent member of the Bar, who demonstrates a willingness to identify himself with the interests of the defendant and who will assert such defenses as are available to him under the law and consistent with the ethics of the

profession." *Kryger,* 479 P.2d at 480. "The failure of such representation constitutes a departure from due process of law." *Id.*

Defendants testified they understood that Musselman would represent one of them, and that Hatch would assist Musselman and represent the other, with Musselman taking the lead at trial. Hatch testified his understanding was the same as defendants', so he prepared for a trial in which he would be assisting Musselman, with Musselman doing most of the work. The record reflects that even the trial court understood that Musselman and Hatch would represent defendants at trial. Musselman, on the other hand, denied agreeing to represent defendants, and did not appear at trial. When Musselman failed to appear, the trial court called Alldrege out of the audience to sit at counsel table. However, both defendants and Hatch testified that Alldrege was not defendants' lawyer. Moreover, defendants even testified that Alldrege told them not to ask him any questions. None of the three attorneys claim to have understood that he would act as defendants' lead counsel at trial. Hatch pointed his finger at Musselman and Musselman pointed his finger at Hatch, while Alldrege simply looked on.

This troubling scenario thus contains three attorneys from the same firm who all had contact with defendants during the pretrial and trial proceedings, but of whom none intellectually or emotionally took responsibility for defendants' case. Instead, one attorney, while waiting for another one to appear and take over, merely went through the motions of representing defendants without knowing before the trial began that he would do so. As it occurred, defendants' legal representation thus was simply "a sham or pretense of an appearance." *Kryger,* 479 P.2d at 480. Defendants did not have a legal counselor who took full responsibility for their case.

 The trial court did not make a finding of fact following the Rule 23B hearing regarding who acted as defendants' counsel, but it did conclude that Hatch's pretrial preparation did not, in and of itself, amount to ineffective assistance of counsel. However, because Hatch did not act as defendants'

counsel, in that he never accepted responsibility for their representation, the trial court erred by concluding defendants were not denied effective assistance of counsel.

 We hold that under the Sixth Amendment, a defendant is denied the effective assistance of counsel when, as in this case, a lawyer is requested, but no lawyer accepts actual responsibility for preparation and defense of the case. This is not to say that more than one lawyer may not fulfill this responsibility simultaneously, or sequentially. However, when no single lawyer, or group of lawyers, undertakes to represent the interests of the accused at all appropriate stages of the proceedings, that failure constitutes the denial of the constitutionally protected right to the effective assistance of counsel.

Reversed and remanded for a new trial.

BILLINGS and JACKSON, JJ., concur.