**STATE of Utah, Plaintiff and Appellee,**

v.

**Paul G. BREDEHOFT, Defendant and Appellant.**

**No. 941724–CA.**

Court of Appeals of Utah.

Oct. 1, 1998.

Robert K. Heineman, Salt Lake Legal Defender Ass'n, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen. and J. Frederic Voros Jr., Ass't. Atty. Gen., Criminal Appeals Div., Salt Lake City, for Appellee.

Before WILKINS, Associate P.J., and BILLINGS and ORME, JJ.

## OPINION

ORME, Judge:

Defendant Paul G. Bredehoft appeals his conviction for automobile homicide in the death of young Sean Adkins, a second degree felony, in violation of Utah Code Ann. § 76–5–207(2) (1995).[1] We affirm.

## BACKGROUND

"On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Brown*, 948 P.2d 337, 339 (Utah 1997).

At about 7:10 p.m. on March 1, 1994, seven high school boys were driving west on Interstate 80, on their way to a basketball game, when their station wagon blew a tire. After exiting the freeway at the 2100 South exit, the boys pulled over into the emergency lane to change the tire. At about 7:35 p.m., one of the boys who was sitting in the station wagon noticed lights shining directly into the rearview mirror, illuminating the car's interior more than other passing car headlights had done. Although the posted speed limit was 40 miles per hour, Bredehoft, driving a red Mustang, had swerved into the emergency lane and was racing toward the station

---

1. As a convenience to the reader, and because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

wagon at approximately 50 to 65 miles per hour. Bredehoft never slowed down or took any evasive action before slamming into the rear of the station wagon. Two boys were sitting in the car, while the others had jumped the guardrail to safety. The impact knocked the station wagon thirty-three feet and over the top of the guardrail.

After the collision, the boys realized that one of their group, Sean Adkins, was missing. The boys found Sean's body 113 feet down the road. He had been struck, most likely by the dislodged station wagon, while running away. After arriving at the scene, Utah Highway Patrol Trooper Jeff Peterson found Bredehoft sitting on the guardrail with a broken finger and a cut lip, smelling of alcohol, and appearing "extremely intoxicated."

Trooper Peterson led Bredehoft to an ambulance and placed him under arrest for driving under the influence. While in the ambulance, Trooper Peterson advised Bredehoft that his blood would be drawn. Aside from relaying this information, Trooper Peterson engaged in no other conversation with Bredehoft regarding the blood draw. Without objection or resistance, Bredehoft offered his arm and allowed his blood to be drawn. One of the ambulance personnel made the blood draw at 8:18 p.m.[2] A chemical analysis showed Bredehoft had the extremely high blood alcohol level of .27 percent.

En route to the hospital, Bredehoft repeated, "I have killed a kid," two or three times. At the hospital, Bredehoft was examined and determined to have only minor injuries. When asked what had happened, Bredehoft responded, "I was driving drunk and I killed a kid." Sean Adkins was pronounced dead on arrival at LDS Hospital.

On March 7, 1994, the State charged Bredehoft with (1) automobile homicide, a second degree felony, in violation of Utah Code Ann. § 76–5–207(2) (1995); (2) driving on a denied, suspended, disqualified, or revoked license, a class B misdemeanor, in violation of Utah Code Ann. § 53–3–227 (1998); (3) driving without registration or certificate of title, a class C misdemeanor, in violation of Utah

Code Ann. § 41–1a–1303 (Supp.1998); and (4) operation of vehicle without security, a class B misdemeanor, in violation of Utah Code Ann. § 41–12a–302(1) (Supp.1998). Bredehoft pled guilty to every offense except automobile homicide, which proceeded to trial.

Before trial, Bredehoft moved to suppress the blood evidence, arguing that because Trooper Peterson had no warrant, consent, or other lawful basis for doing so, drawing Bredehoft's blood violated the Fourth Amendment of the United States Constitution and Article I, section 14 of the Utah Constitution. The trial court denied Bredehoft's motion to suppress, ruling that exigent circumstances, such as Trooper Peterson's concerns about the dissipation of blood alcohol and the possible loss or corruption of that evidence, obviated the need for a warrant.

Also before trial, Bredehoft filed a motion to compel discovery regarding the State's expert witnesses under Utah Code Ann. § 77–17–13(1) (1995). Bredehoft sought a list of the expert witnesses the State intended to call at trial and a written report of the substance of their testimony. The trial court granted Bredehoft's motion, ordering the State to provide written reports or testimony proffers for its expert witnesses by August 8, 1994.

On August 29, 1994, the day before trial, the State disclosed that one of its witnesses, Utah Highway Patrol Trooper Gary Zdunich, would testify as an expert on the physiological effects of certain blood alcohol levels. Bredehoft objected to this proposed testimony, arguing the State's late designation of this witness prejudiced him because he could not obtain a countering defense expert on such short notice. Although the trial court reserved ruling on whether to exclude his testimony, Zdunich testified only in rebuttal to Bredehoft's testimony, and not during the prosecution's case-in-chief.

However, during its case-in-chief the prosecution did offer the testimony of Dr. Raymond Middleton, the medical director of the

---

2. Concerned that Bredehoft's body would metabolize the alcohol, and wanting "an accurate indication of what his blood alcohol was at the time

of the accident," Trooper Peterson testified that he decided to have Bredehoft's blood drawn immediately, with or without his consent.

Dayspring drug and alcohol treatment program. The State had never identified Dr. Middleton as a potential expert regarding the physiological effects of a .27 percent blood alcohol content. In fact, before trial, the State represented that Dr. Middleton would testify only to the substance of lectures he presented for the Dayspring alcohol treatment program, which Bredehoft had attended. Nonetheless, on direct examination, Dr. Middleton testified that the fine motor coordination of a person with a .27 percent blood alcohol level would be "[v]ery much impaired," and that, at this level, many people "would be approaching [a] comatose state." Bredehoft objected, arguing that Dr. Middleton's testimony was "moving over into the expert opinion area ... and he was not designated as an expert witness to testify on the effects of" blood alcohol levels. Bredehoft implored the trial court to "follow the statute on expert witnesses at this point." Although noting that Dr. Middleton's testimony was "based upon his training ... and experience and expertise," the trial court admitted Dr. Middleton's testimony. On cross-examination, Dr. Middleton conceded that the lectures he presented for the Dayspring alcohol treatment program did not address the effects of specific blood alcohol levels.

In his defense, Bredehoft testified that the collision resulted when another car forced him into the emergency lane to avoid being hit. He claimed to have checked his blind spot and mirrors for that car, and that he then looked up and saw "some movement" and "swerved to the lane of travel and there was, I don't know, an impact." On cross-examination, Bredehoft testified that, before the collision, he had consumed alcohol at three different bars, including Uncle Bart's and Charley's Club, where he had gone to find a friend, Doug Mickelson. However, Bredehoft testified that he did not feel intoxicated when the collision occurred. It was in rebuttal to this testimony that Trooper Zdunich testified that a blood-alcohol level of .27

percent would impair judgment, coordination, vision, balance, reflexes, and energy. Bredehoft does not challenge the propriety of this testimony on appeal.

After a six-day trial, the jury found Bredehoft guilty of automobile homicide. The trial court sentenced him to serve one-to-fifteen years at the Utah State Prison, to run consecutively to the concurrent sentences of up to six months for his other offenses, and to pay a $10,000 fine and full restitution. Bredehoft appealed, raising numerous arguments, including that his privately retained trial counsel rendered ineffective assistance.

Early in the course of his appeal, Bredehoft filed a motion for remand, pursuant to Rule 23B of the Utah Rules of Appellate Procedure,[3] seeking to supplement the record so his claim of ineffective assistance of counsel could be determined. Bredehoft claimed that his trial attorney, James D. Mickelson, provided ineffective assistance of counsel due to Mickelson's business association with two of the three bars at which Bredehoft had been drinking on the night in question.

On August 12, 1996, we remanded this case to the trial court for entry of findings of fact relevant to Bredehoft's ineffective assistance claim, and on October 2, 1996, the trial court held an evidentiary hearing. At the hearing, the trial court took evidence and entered findings of fact necessary to determine Bredehoft's ineffective assistance claim. "We defer to a trial court's findings of fact after a rule 23B hearing," *State v. Taylor*, 947 P.2d 681, 685 (Utah 1997), and we recite these facts accordingly.

Mickelson represented Bredehoft throughout his entire trial. Mickelson's family, including his father, Doug Mickelson, owned and operated Uncle Bart's and Charley's Club. Bredehoft and Mickelson had known each other for almost fifteen years, associating in both social and business situations, and Mickelson had represented Bredehoft in a

---

**3.** Rule 23B provides, in pertinent part:

A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact necessary for the appellate court's determination of a claim of ineffective assistance of counsel. The mo-

tion shall be available only upon a nonspeculative allegation of facts not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective.

Utah R.App. P. 23B(a).

previous DUI case. Bredehoft knew that Uncle Bart's and Charley's Club were Mickelson family operations, and he had even performed janitorial and other services for these businesses.

Uncle Bart's and Charley's Club are non-profit private clubs, operated by Club Management, Inc., a for-profit entity owned by the Mickelson family. Mickelson's parents depend on the revenue generated by these clubs and their management entity for their livelihood. Although Mickelson was an officer of the clubs and a part-owner of their related management company, he did not receive any direct payments from these entities. However, Mickelson may have received attorney fees for advising these businesses. Although he performed legal services for them during the pendency of this case, Mickelson never represented his family's businesses in any manner connected with the 1994 homicide.

Mickelson was aware that the clubs faced potential civil liability for serving liquor to Bredehoft, but he did not consider himself to have any personal exposure to criminal liability. Moreover, Mickelson was not aware of Utah Code Ann. § 32A–12–103(2) (1994), which can impose vicarious criminal liability upon an officer of a corporation operating a licensed club where a criminal violation occurs. He was also unaware of any criminal case brought against a club or its officers in which the prosecution sought to use the testimony of a patron charged with driving under the influence.

On two occasions, Mickelson discussed with Bredehoft the possibility that civil claims could be asserted against them both. During the first discussion, Mickelson addressed potential conflicts arising out of a possible future civil action, explaining that his ties to the club might unconsciously affect his representation. However, he asserted his belief that there would be no likelihood of criminal liability on the clubs' part, and that his association with the clubs would not affect his representation of and loyalty to Bredehoft. Mickelson also suggested that Bredehoft consult another attorney. Although Bredehoft considered doing so, he did not consult other counsel. He decided to stay with Mickelson.

During their second discussion, Mickelson again told Bredehoft that a potential conflict may exist which could unconsciously affect Mickelson's representation, but stated that he was loyal to Bredehoft and did not feel his association with the clubs would negatively affect his representation. Mickelson further informed Bredehoft that the prosecution had not shown any intention to file criminal charges against the clubs. In both discussions, Bredehoft said he understood the potential conflict but wanted Mickelson to continue representing him anyway. Apparently because he believed he had no actual conflict in this case, and only the possibility of a potential conflict, Mickelson made no disclosures to the magistrate or judge and prepared no written waiver.

Before and during trial, Mickelson repeatedly discussed the idea of a plea bargain with prosecutors. However, Bredehoft had previously been convicted of driving under the influence, the victim in this case had died, and the case had received extensive publicity. Consequently, the prosecution determined that it would not plea bargain Bredehoft's case and never showed any willingness to even consider compromising the case in any way. Even when it briefly appeared that a mistrial might occur, prosecutors rejected Mickelson's plea offer, insisting, "[w]e'll take our chances here, we're not pleading it."

## ISSUES AND STANDARDS OF REVIEW

Bredehoft raises three issues on appeal. First, he contends his Sixth Amendment right to the effective assistance of counsel was violated because Mickelson had an actual conflict of interest that adversely affected Bredehoft's representation. In ruling on an ineffective assistance claim following a Rule 23B hearing, "we defer to the trial court's findings of fact, but review its legal conclusions for correctness." *State v. Classon,* 935 P.2d 524, 531 (Utah Ct.App.), *cert. denied,* 945 P.2d 1118 (Utah 1997).

Second, Bredehoft challenges the trial court's refusal to suppress all evidence of Bredehoft's blood alcohol level, asserting the

evidence was obtained from a warrantless blood draw in violation of the Fourth Amendment. "We review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence [under the Fourth Amendment] using a clearly erroneous standard. We review the trial court's conclusions of law based on these facts under a correctness standard." *State v. Brown*, 853 P.2d 851, 854–55 (Utah 1992).

■ Finally, Bredehoft argues the trial court erred in allowing Dr. Raymond Middleton to testify about the physiological effects of a .27 percent blood alcohol level because the State failed to follow section 77–17–13's expert witness notice requirement. We review a trial court's rulings on section 77–17–13 objections only for an abuse of discretion. *See State v. Begishe*, 937 P.2d 527, 530 (Utah Ct.App.1997).

The State requests that we strike portions of Bredehoft's brief which refer to "facts" contained in the affidavit he submitted in support of his motion for a Rule 23B hearing. The State contends such "facts" are not appropriately before us. We first address the State's Rule 23B argument.

## ANALYSIS

### I. Rule 23B Motion

In support of his Rule 23B motion, Bredehoft submitted his affidavit to this court pursuant to Rule 23B(b) of the Utah Rules of Appellate Procedure. At the hearing before the trial court on this motion, Bredehoft offered the affidavit as an evidentiary exhibit. The State objected, arguing Bredehoft was attempting to place his testimony before the court without subjecting himself to cross-examination. The trial court ruled that it would receive the affidavit as evidence, but only if Bredehoft took the stand, testified consistently with the affidavit, and allowed his testimony to be cross-examined. Bredehoft elected not to do so, and thus the court did not receive the affidavit into evidence.

The trial court heard Mickelson's testimony, took other evidence, and entered factual findings regarding Bredehoft's ineffective assistance claim. Although he does not challenge those findings on appeal, Bredehoft relies upon and cites to certain unsupported facts alleged in his Rule 23B affidavit as substantive evidence supporting his claim that Mickelson labored under an actual conflict.

As indicated, the State filed a motion with this court to strike the portions of Bredehoft's brief that rely upon his Rule 23B affidavit, arguing the affidavit is not properly before us and cannot be considered substantive evidence of ineffective assistance. The State's argument is well taken.

■ We consider affidavits supporting Rule 23B motions solely to determine the propriety of remanding ineffective assistance of counsel claims for evidentiary hearings. *See generally State v. Garrett*, 849 P.2d 578, 581–82 (Utah Ct.App.) (discussing predicate requirements for obtaining Rule 23B remand), *cert. denied*, 860 P.2d 943 (Utah 1993). Once we have granted a Rule 23B motion, affidavits supporting the original motion have served their purpose and do not automatically become evidence before the trial court on remand. After the trial court has entered factual findings on remand, we defer to those findings. *See State v. Taylor*, 947 P.2d 681, 685 (Utah 1997). Moreover, "we do not consider new evidence on appeal." *Low v. Bonacci*, 788 P.2d 512, 513 (Utah 1990).

■ Accordingly, we will not disturb a trial court's refusal to receive evidence in Rule 23B remand proceedings unless the trial court has abused the high level of discretion we accord it in arriving at its factual findings in these proceedings. No such abuse of discretion occurred here. There was no opportunity to judge Bredehoft's credibility regarding the facts alleged in his affidavit and, at Bredehoft's election, the State had no opportunity to cross-examine him. Bredehoft declined the opportunity to have the trial court consider his affidavit testimony in the Rule 23B hearing and, consequently, cannot rely upon these unsubstantiated allegations on appeal as proof of ineffective assistance of counsel. Therefore, the State's motion to strike portions of Bredehoft's brief is granted. We will not consider the affidavit or any reference to it in the briefs.

## II. Ineffective Assistance of Counsel— Conflict of Interest

 Bredehoft contends that Mickelson had an actual conflict of interest in representing him and that he was consequently denied his right to effective assistance of counsel, as guaranteed by the Sixth Amendment to the United States Constitution.[4] Specifically, Bredehoft claims that Mickelson's familial, ownership, and management interests in Uncle Bart's and Charley's Club (the clubs) establish an actual conflict of interest between Mickelson and Bredehoft. According to Bredehoft, Mickelson's concerns regarding potential civil[5] and criminal[6] liability faced by himself, his family, and the clubs conflicted with Bredehoft's interests.

" '[A] sixth amendment claim grounded on conflict of interest is a special subtype of an ineffectiveness claim' and must be analyzed under [a] standard ... which is different than that used for other ineffective assistance of counsel claims." *State v. Johnson,* 823 P.2d 484, 488 (Utah Ct.App.1991) (quoting *State v. Velarde,* 806 P.2d 1190, 1192 (Utah Ct.App.1991)). Specifically, "[d]efendants claiming ineffective assistance of counsel resulting from a conflict of interest must show that 'an actual conflict of interest adversely affected his lawyer's performance.' " *State v. Taylor,* 947 P.2d 681, 686 (Utah 1997) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980)). " 'In order to establish an actual conflict, [the defendant] must demonstrate "as a threshold matter ... that the defense attorney was required to make a choice ad-vancing his own interests to the detriment of his client's interests." ' " *Id.* (alterations in original) (citations omitted). "Once a defendant demonstrates an actual conflict, there is no need to show prejudice." *Id.* We conclude Bredehoft wholly fails to demonstrate an actual conflict. On the contrary, he and Mickelson's interests in the criminal case were entirely compatible.

Both Bredehoft and Mickelson had the single, shared goal of Bredehoft's exoneration. If Bredehoft were found not guilty, which, judging from his testimony at trial, was his obvious desire, imposing vicarious criminal liability on Mickelson or his family would be impossible and imposing dramshop or other civil liability on Mickelson, his family, or the clubs would be far more difficult. Under these circumstances, Bredehoft has failed to demonstrate, as a threshold matter, that Mickelson "was required to make a choice advancing his own interests to the detriment of [Bredehoft's] interests." *Id.* To the contrary, Mickelson's and Bredehoft's interests were consistent, and, if anything, Mickelson had more than the usual incentive to vigorously defend his client and secure his acquittal.

As Bredehoft points out, he and Mickelson would have likely had a conflict in subsequent civil litigation. However, that does not change the fact that their interests were fully aligned in the criminal proceeding actually at issue in this appeal.

Bredehoft also argues that a less directly interested attorney might have negotiated a

---

4. Bredehoft also argues he was denied effective assistance of counsel as guaranteed by article I, section 12 of the Utah Constitution. However, he does not independently brief the state constitutional question and we therefore consider only the federal question. *See State v. Hovater,* 914 P.2d 37, 39 n. 1 (Utah 1996) (refusing to address ineffective assistance claim under article I, section 12 where defendant provided no analysis independent of Sixth Amendment argument).

5. Utah Code Ann. § 32A–14–101 (Supp.1998) imposes dramshop liability on persons who serve alcoholic beverages *to patrons whom the server knows* or should know are intoxicated. In November 1994, Sean Adkins's parents filed a civil action against Uncle Bart's, Charley's Club, Club Management, Inc., James Mickelson, Doug Mick-elson (James's father), Bredehoft, and others. Mickelson, however, never believed that he or any members of his family had any personal liability, and Mickelson was in fact dismissed from the case before it went to trial.

6. Under Utah Code Ann. § 32A–12–103(2) (1994), officers or agents of corporations that violate the Utah Alcoholic Beverages Code are considered parties to the offense and are personally liable as principal offenders. However, we are aware of no Utah cases in which criminal charges have been brought against the officers or agents of an establishment serving alcohol based on the commission of a patron's alcohol-related crime, and the State brought no criminal charges against Mickelson, his family, or the clubs.

plea bargain whereby Bredehoft could plead to a lesser offense or get favorable sentencing consideration in exchange for testimony against Mickelson, his family, the clubs, or their employees. This argument is, at best, a fantasy. This is clearly not a bargain the prosecution would have made. Even in the face of a possible mistrial, the prosecution adamantly maintained its outright refusal to enter any plea bargain with Bredehoft—a decision based on Bredehoft's previous DUI convictions coupled with the tragic and well-publicized nature of this case. We are wholly unpersuaded that the prosecution would have deviated from this position to pursue unprecedented misdemeanor convictions against Mickelson, his family, and the clubs.

### III. Warrantless Blood Draw

Bredehoft contends the trial court should have suppressed evidence of his .27 percent blood alcohol content as a product of an illegal search and seizure in violation of the Fourth Amendment. Specifically, Bredehoft argues that, at least given the availability of a telephonic warrant, the trial court erred in concluding that the dissipation of blood-alcohol evidence created an exigent circumstance justifying the warrantless blood draw.[7]

The Fourth Amendment prohibits unreasonable searches and seizures, including where the drawing and ensuing chemical analysis of blood is concerned. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989). "[S]earches conducted without a warrant 'are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *State v. Ashe,* 745 P.2d 1255, 1258 (Utah 1987) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)) (emphasis omitted). Such recognized exceptions

> include consent searches, *Washington v. Chrisman,* 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); searches and seizures incident to lawful arrest based on probable cause under exigent circumstances, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, ... (1969); searches and seizures made in hot pursuit, *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); searches and seizures of contraband in areas lawfully accessible to the public, *State v. Shreve,* 667 P.2d 590 (Utah 1983); and seizure of evidence in plain view after lawful intrusion, *State v. Harris,* 671 P.2d 175 (Utah 1983).

*State v. Brown,* 853 P.2d 851, 855 (Utah 1992).

Although the trial court relied on the exigent circumstances exception in refusing to suppress the blood-draw evidence, "[i]t is well-settled that an appellate court may affirm a trial court's ruling on any proper grounds, even though the trial court relied on some other ground." *DeBry v. Noble,* 889 P.2d 428, 444 (Utah 1995). Accordingly, while we affirm the trial court's ruling, we do so on the ground that Bredehoft consented to the warrantless blood draw.

"A warrantless search conducted pursuant to a consent that is voluntary in fact does not violate the fourth amendment." *State v. Webb,* 790 P.2d 65, 82 (Utah Ct.App.1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973)). Rather than objecting or resisting when told of the need to draw his blood, Bredehoft willingly produced his arm and allowed the ambulance personnel to take a blood sample. Thus, our only concern is whether Bredehoft's consent to the blood draw was voluntary. *Cf. State v. Castner,* 825 P.2d 699, 704 (Utah Ct.App.1992).

"Generally, whether the requisite voluntariness exists depends on 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of' police conduct."[8] *State v. Arroyo,* 796

---

7. Bredehoft also challenges the trial court's finding that the blood draw occurred at 8:20 p.m. rather than at 8:18 p.m. Even if we did conclude that this finding was clearly erroneous, the two minute time difference is irrelevant to our disposition of this issue.

8. In assessing the details of police conduct, "'[w]hether a Fourth Amendment violation has occurred "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him [or her] at the time," and not on the officer's actual state of mind at the time the challenged action was tak-

P.2d 684, 689 (Utah 1990) (quoting *Schneck-loth*, 412 U.S. at 226, 93 S.Ct. at 2047). In determining whether a defendant voluntarily consented to a warrantless search, "[w]e further look to see if there is clear and positive testimony that the consent was unequivocal and freely given." *Castner*, 825 P.2d at 704.

Specific factors guiding the voluntariness determination include

> 1) the absence of a claim of authority to search by the officers; 2) the absence of an exhibition of force by the officers; 3) a mere request to search; 4) cooperation by the [party being searched] and 5) the absence of deception or trick on the part of the officer.

*State v. Whittenback*, 621 P.2d 103, 106 (Utah 1980). In the context of a warrantless blood draw, additional relevant considerations include whether the defendant resisted the blood draw or reasonably believed the blood was being drawn for medical rather than law enforcement purposes. *See In re I.,R.L.*, 739 P.2d 1123, 1128 (Utah Ct.App.1987), *vacated on other grounds*, 771 P.2d 1068 (Utah 1989).

 In this case, the totality of the surrounding circumstances, including Bredehoft's characteristics and Trooper Peterson's conduct, compel the conclusion that Bredehoft voluntarily consented to the blood draw. In particular, Trooper Peterson's clear and positive testimony demonstrates that Bredehoft's consent to the blood draw was unequivocal and freely given.

Bredehoft was in an ambulance, not a patrol car; Trooper Peterson was the sole officer present; and no weapons were drawn. Trooper Peterson made no express claim of authority to draw Bredehoft's blood, nor did he exhibit any force. Moreover, Trooper Peterson engaged in no deception or trickery in eliciting Bredehoft's consent to the blood draw. Specifically, the fact that Bredehoft was informed of the blood draw by Trooper Peterson, rather than the ambulance personnel, reasonably apprised Bredehoft, who had prior experience with DUI investigations, that the blood draw was for law enforcement rather than medical purposes. In other words, Trooper Peterson advised Bredehoft that his blood would be drawn in the complete absence of any coercive factors.[9]

In response, Bredehoft offered his complete cooperation. He did not resist, struggle, say "no," or object in any way; nor did he request a less intrusive breathalyzer test, the opportunity to consult with counsel, or that Trooper Peterson first obtain a warrant. Instead, he simply offered his arm to the ambulance personnel and permitted his blood to be drawn.

While Trooper Peterson subjectively intended to take the blood with or without Bredehoft's consent, this private intention does not change the fact that the hoped-for consent, although not verbalized, was nonetheless forthcoming. *See supra* note 8. More importantly, our analysis turns on an objective assessment of Trooper Peterson's actions in light of the facts and circumstances confronting him, not on Trooper Peterson's subjective state of mind when Bredehoft's blood was drawn. *See Archuleta*, 850 P.2d at 1238; *supra* note 8.

Accordingly, the warrantless draw and ensuing chemical analysis of Bredehoft's blood did not violate the Fourth Amendment because Bredehoft voluntarily consented to the blood draw. Hence, we affirm the trial court's admission of the blood-draw evidence.

en.'" *State v. Archuleta*, 850 P.2d 1232, 1238 (Utah 1993) (quoting *Maryland v. Macon*, 472 U.S. 463, 470, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978))). Thus, Trooper Peterson's unexpressed intention to have Bredehoft's blood drawn with or without consent, *see supra* note 2, is of no consequence.

9. Although Bredehoft was in custody when the blood draw took place, "the fact that [a] defendant was in custody is not enough, standing alone, to demonstrate the lack of voluntariness." *State v. Dunn*, 850 P.2d 1201, 1219 (Utah 1993). Instead, "[i]t is but a single element ... to consider." *State v. Bobo*, 803 P.2d 1268, 1274 (Utah Ct.App.1990). Bredehoft was in an ambulance, not at a police station or other more coercive environment. Moreover, he was not handcuffed or otherwise restrained and was in the presence of only one officer. Under these circumstances, we do not believe that the fact that Bredehoft was in custody vitiates our conclusion that he voluntarily consented to the blood draw.

## IV. Expert Testimony Notice
## Under Section 77–17–13

Bredehoft argues the trial court abused its discretion in admitting Dr. Middleton's expert testimony concerning the physiological effects of a .27 percent blood alcohol level. Specifically, Bredehoft contends admitting this testimony was improper where the State failed to notify him of its intent to call Dr. Middleton as an expert within thirty days before trial, as required by Utah Code Ann. § 77–17–13(1)(a) (1995).

"The expert witness notification statute, Utah Code Ann. § 77–17–13(1)(a) (1995), provides that in a felony case, a party intending to have an expert testify must give the opposing party notice 'as soon as practicable but not less than 30 days before trial.'" *State v. Arellano,* 347 Utah Adv. Rep. 14, 15, 964 P.2d 1167, 1169 (Utah Ct.App.1998) (quoting Utah Code Ann. § 77–17–13(1)(a) (1995)). Denying a defendant's requests for relief despite the State's clear violation of this statute is an abuse of discretion. *See id.* at 17, 964 P.2d at 1169; *State v. Begishe,* 937 P.2d 527, 532 (Utah Ct.App.1997). Given the State's failure to identify Dr. Middleton as an expert on the effects of high blood alcohol levels before trial, and its representation that Dr. Middleton would testify only on the content of his lectures, it would certainly appear that the trial court abused its discretion in admitting Dr. Middleton's testimony concerning the effects of a .27 percent blood alcohol level over Bredehoft's section 77–17–13 objections. However, "[a]n erroneous decision by a trial court 'cannot result in reversible error unless the error is harmful.'" *State v. Robertson,* 932 P.2d 1219, 1227 (Utah 1997) (quoting *State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992)).

"Harmless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings. Put differently, an error is harmful only if the likelihood of a different outcome is sufficiently high that it undermines our confidence in the verdict." *Id. See* Utah R.Crim. P. 30(a). In applying this standard to erroneously admitted testimony, we consider several factors, including

"the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

*State v. Hackford,* 737 P.2d 200, 205 (Utah 1987) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)). *See State v. Villarreal,* 889 P.2d 419, 425–26 (Utah 1995).

In this case, the few statements Dr. Middleton made regarding the physiological effects of a .27 percent blood alcohol level were merely cumulative of Trooper Zdunich's properly admitted and unchallenged rebuttal testimony. In light of Trooper Zdunich's testimony, Dr. Middleton's testimony was not important to the prosecution's case [10] which, considering the properly-admitted blood-alcohol evidence and the boys' eyewitness testimony, was quite strong.

Based on all of these considerations, the likelihood of a different outcome had the trial court sustained Bredehoft's objection to Dr. Middleton's testimony is nonexistent and thus is insufficiently high to undermine our confidence in the verdict. Therefore, any error committed by the trial court in admitting this testimony was harmless.

## CONCLUSION

First, because Bredehoft's Rule 23B affidavit was not properly before the trial court at the Rule 23B hearing, we grant the State's motion to strike portions of Bredehoft's brief relying on this affidavit. Accordingly, we do not consider any facts alleged in Bredehoft's

---

**10.** Dr. Middleton's testimony was also not important to the prosecution's case in that the testimony's subject matter was largely within the province of the jury's experience and understanding. Considering the jury was aware that Bredehoft would have been legally intoxicated at a blood alcohol level of .08, testimony that he would be very impaired at over three times that level involves more of an axiomatic conclusion than the esoteric and technical insights generally reserved for expert testimony.

Rule 23B affidavit in this appeal. Second, we conclude that because he was never required to make a choice advancing his own interests to the detriment of Bredehoft's interests, Mickelson did not labor under an actual conflict of interest which adversely affected Bredehoft's representation. Therefore, Bredehoft was not denied his Sixth Amendment right to the effective assistance of counsel. Third, because Bredehoft voluntarily consented to the drawing of his blood, the warrantless blood draw did not violate the Fourth Amendment. Finally, any error committed by the trial court in allowing Dr. Middleton's expert testimony regarding the physiological effects of a .27 percent blood alcohol content was harmless.

Affirmed.

WILKINS, Associate P.J., concurs.

BILLINGS, J., concurs, except that as to Section III, I concur only in the result.