2007 UT App 184

**STATE of Utah, Plaintiff and Appellee,**

v.

**Terry L. JOHNSON, Defendant and Appellant.**

**No. 20050169–CA.**

Court of Appeals of Utah.

June 1, 2007.

Rehearing Denied July 10, 2007.

---

Theodore R. Weckel, Danville, Virginia, for Appellant.

Mark L. Shurtleff and Christopher D. Ballard, Salt Lake City, for Appellee.

Before Judges BENCH, BILLINGS, and McHUGH.

## OPINION

BILLINGS, Judge:

¶ 1 Defendant Terry L. Johnson appeals his conviction for murder, a first degree felony. *See* Utah Code Ann. § 76-5-203 (Supp. 2006). On appeal, Defendant asserts that the trial court erred in denying his motion for a new trial because certain evidence was erroneously admitted at trial, *see* Utah R. Evid. 404(b); his trial counsel's assistance was ineffective; and the prosecutor engaged in prosecutorial misconduct during closing argument. We affirm.

## BACKGROUND [1]

¶ 2 In 1993, Sylvia Mosier (Mosier) and her fourteen-year-old son, Christopher Mosier (Christopher), lived together in an apartment in Taylorsville, Utah. Mosier was employed as a waitress and wanted to earn some extra money, so she placed an ad in the newspaper offering babysitting services. Defendant and his wife, Linda Johnson (Wife) [2], responded to the ad, and Mosier began babysitting the couple's two-month-old baby around the end of November 1993. On December 30, 1993, Wife left the baby with Mosier around 1:00 p.m. Mosier understood that Defendant would pick up the baby at 5:00 p.m. When 5:00 p.m. passed and Defendant had yet to arrive, Mosier began to worry because she had to be at work at 6:00 p.m. Christopher told his mother that he would take over babysitting until Defendant arrived, and Mosier left for work at 5:45 p.m.

¶ 3 At about 7:10 p.m., Mosier called Christopher to check on him. Christopher said that the baby was fine and that the baby was still at their apartment. At about 7:30 p.m., Christopher's grandmother called him and spoke with him for about five minutes. Christopher told her that both he and the baby were fine. Mosier called Christopher at about 7:45 p.m. and again at about 8:00 p.m. Christopher did not answer either of those calls. Mosier left work at approximately 9:00 p.m. and arrived home about twenty minutes later.

¶ 4 Upon returning to her apartment, Mosier found Christopher lying on the floor in her darkened bedroom. Mosier realized that Christopher was dead, and she called her mother and 911. Defendant's baby was not in the apartment.

¶ 5 Christopher had been stabbed fifteen times—once in the back, and fourteen times in his chest and abdomen. Christopher also had defensive wounds to his left arm, his right leg, and both of his hands. The medical examiner did not notice any injuries that appeared to have been a few days old. All of Christopher's injuries "appeared to be recent sharp-force injuries."

¶ 6 Upon investigation, police found missing from the Mosiers' apartment a video camera, a 35–millimeter camera, and a bar of soap from the bathroom sink. Also, Christopher's piggy bank had been knifed open. A

---

1. We recite the facts in the light most favorable to the jury verdict. *See State v. Valdez*, 2006 UT App 290, ¶ 1 n. 2, 141 P.3d 614 (considering an appeal from the trial court's denial of a new trial and "view[ing] the facts in the light most favorable to the jury verdict and recit[ing] them accordingly").

2. Defendant and Linda Johnson have since divorced. However, because Defendant and Ms. Johnson were married at the time of the murder and for the sake of convenience, we refer to Ms. Johnson as Defendant's wife.

striker plate[3] on a door jamb in the apartment was bent out. Mosier told police that she had kept the video camera in the living room, but had moved it into her bedroom because she saw Defendant "look at it like . . . he wanted it."

¶ 7 The night Christopher was murdered, Defendant picked up the baby from Christopher. After leaving the Mosiers' apartment, Defendant went to visit his friend, Madgy Hassan, in North Salt Lake. Defendant arrived at Hassan's apartment around 8:30 or 9:00 p.m. with the baby, alcohol, and crack cocaine. Hassan told police that upon arrival, Defendant went into the bathroom and changed his clothing. In fact, Hassan told police that Defendant took so long in the bathroom that Hassan went to check on Defendant. Hassan also told police that Defendant put some clothes in a bag and took the bag with him. Hassan further disclosed that Defendant left a bar of soap in Hassan's apartment.

¶ 8 After about an hour at Hassan's apartment, Defendant called Wife and asked her to come pick up the baby because he was too drunk to drive. Wife was relieved to find that Defendant had the baby because she went to pick up the baby from the Mosiers' apartment around 8:15 or 8:30 p.m., but no one answered the door. When she could not get anyone to answer the door at the Mosiers' apartment, Wife called Christopher's grandmother to ask if she knew where the baby was.

¶ 9 The police met Wife when she arrived at home after picking up the baby from Defendant at Hassan's apartment. A detective collected two baby blankets and the baby's clothes. Wife then called Defendant at Hassan's apartment and told him that police wanted to talk to him. Defendant came right home.

¶ 10 On New Year's Day 1994, Defendant returned to Hassan's apartment and told Hassan that "he couldn't stab somebody 15 or 16 times, that he just couldn't do such a thing." None of the police officers, however, had ever told Defendant how many times the

victim had been stabbed, nor was that information released to the press.

¶ 11 Over the course of the investigation, police interviewed Defendant several times. During the first interview, Defendant told police that he had left work on the night of the murder and had attended a continuing education class for his job. He said he left the class at 6:00 or 6:50 p.m. and picked up the baby sometime between 7:00 and 7:50 p.m. Defendant admitted going to Hassan's apartment, but did not say that he had used drugs there. When police asked Defendant how he felt about a teenage boy babysitting his son, Defendant stated that he did not want Christopher babysitting because he was only fourteen-years old. Defendant, however, had previously told Wife that he assumed Christopher was molesting their son because he had seen a news report about a teenage boy who had molested an infant. Defendant had also previously told Wife that "if anybody hurt his son . . . he'd pay."

¶ 12 In a second interview with police, a few days after the first interview, Defendant stated that on the night of the murder, he went to the school where his continuing education class was to be held, but then left because he wanted to drink and party that night. Defendant told officers that Wife was supposed to pick up the baby that night because he had class, but that he nevertheless went to pick up the baby between 7:40 and 7:55 p.m. Defendant also told police that he had used the bathroom at the Mosiers' apartment when he went to pick up the baby. Defendant told police that Christopher was fine when he left the apartment. He also admitted to using drugs at Hassan's apartment that night.

¶ 13 Police asked Defendant to turn over the clothing that he was wearing the night of Christopher's murder. According to Wife, Defendant usually wore a green army jacket in the winter. However, he arrived at Hassan's house wearing only blue jeans and a white shirt. Defendant turned over to police a pair of pants and a shirt, but he did not

3. A striker plate is the piece of metal on the door jamb that the door latch slides into when the door is closed.

turn over a green army jacket. There was no evidence found on Defendant's clothes.

¶ 14 In a third interview, conducted on January 25, 2002, Defendant told police that on the night of Christopher's murder, he had left work and gone to a sexually-oriented business. He denied that he had gone to a continuing education class that night. Defendant again stated that he picked up the baby from Christopher and that he used the bathroom in the Mosiers' apartment. Defendant claimed that he did not call Wife that night to let her know that he had picked up the baby because he did not have her phone number. When police asked Defendant if he had a problem with teenagers babysitting his son, Defendant said that he had no problems. When asked about Hassan, Defendant claimed that Hassan did not do drugs. However, Hassan admitted to using drugs the night of the murder. Defendant also denied wearing the green army jacket because it was too small for him, even though Wife testified that the army jacket belonged to her first husband, who was bigger than Defendant.

¶ 15 In 1994, the two baby blankets and the baby jumper that were seized the night of the murder were sent to the Serological Research Institute (SERI) for DNA testing. SERI's DNA analysis revealed blood stains on all three items. The bloodstains contained "background DNA," meaning DNA from more than one individual. Testing revealed that "[t]he primary or strongest DNA types present in the bloodstains ... are consistent with the victim, Christopher." The report concluded that the specific DNA pattern found in the stains occurred in approximately one in 294,000 Caucasians. Christopher was Caucasian. The report also concluded that the other DNA found on the blanket was most likely from an African–American person. Both Defendant's and the baby's DNA would have contained African–American markers.

¶ 16 In 2001, the State Crime Lab retested the samples from the two baby blankets and the baby jumper using newer, less subjective technology than SERI had used in 1994. The remaining samples from the baby jumper and one of the baby blankets lacked suffi-

cient DNA to analyze. However, a DNA bloodstain from the other baby blanket matched Christopher's DNA at five of thirteen points. The State Crime Lab concluded that the probability of selecting an unrelated random individual with DNA that matched the five points identified from the sample was approximately one in 5.1 million.

¶ 17 After Defendant was arrested for murder, he shared a jail cell with Matt Rushton. The two discussed Defendant's case periodically. One morning, Defendant asked Rushton if he would fabricate a story about Christopher's murder for $100,000. Defendant gave Rushton some facts and left it to Rushton to come up with the rest of the story. Defendant told Rushton to include a person named Brandon, to say something about someone getting their leg caught on a striker plate, to make the murder look like a robbery, and to say that a camera was missing from the house.

¶ 18 Rushton fabricated a story and told it to police. He told police that he had come forward because he had noticed some similarities between the story he had heard and the facts that Defendant had told him about the crime with which Defendant was charged. Rushton also told police that he had reviewed Defendant's discovery papers.

¶ 19 In a subsequent interview, Rushton told police what really happened—that Defendant offered him money to fabricate a story. At trial, Rushton denied having looked at Defendant's discovery documents and explained that he initially lied about having reviewed the discovery documents because "the whole story was a lie." In exchange for Rushton's cooperation, the State agreed to reduce his theft charge from a third degree felony to a class A misdemeanor.

¶ 20 A jury subsequently convicted Defendant of murder. Thereafter, Defendant filed a motion for a new trial claiming, among other things, that evidence of Defendant's drug habit and an incident of domestic violence were admitted in violation of rule 404(b) of the Utah Rules of Evidence. *See* Utah R. Evid. 404(b). Defendant was then appointed new counsel who filed a supple-

mental motion for a new trial adding various claims of ineffective assistance of counsel. The trial court denied the motion for a new trial. Defendant appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 21 First, Defendant asserts that the trial court erred in denying his motion for a new trial because during his trial, the trial court erroneously admitted evidence of a domestic abuse incident in violation of Utah Rule of Evidence 404(b). *See* Utah R. Evid. 404(b). "[W]e review a trial court's decision to admit [rule 404(b)] evidence ... under an abuse of discretion standard." *State v. Nelson–Waggoner,* 2000 UT 59, ¶ 16, 6 P.3d 1120.

¶ 22 Second, Defendant contends that the trial court should have granted his motion for a new trial because his trial counsel rendered ineffective assistance. " '[W]hen reviewing the denial of a motion for a new trial based on an ineffective assistance of counsel claim, we defer to the trial court's factual findings unless clearly erroneous.' " *State v. Hales,* 2007 UT 14, ¶ 37, 152 P.3d 321 (quoting *State v. Brandley,* 972 P.2d 78, 81 (Utah Ct.App. 1998)). However, " 'we review for correctness the trial court's application of the law to the facts.' " *Id.* (quoting *Menzies v. Galetka,* 2006 UT 81, ¶ 58, 150 P.3d 480).

¶ 23 Third, Defendant argues that the prosecutor committed prosecutorial misconduct during closing remarks at trial by stating that Defendant lied and by referring to the evidence that Defendant asserts was improperly admitted under rule 404(b). *See* Utah R. Evid. 404(b). This issue was not properly preserved for appeal, and on appeal, Defendant does not argue that plain error occurred or that exceptional circumstances exist. Therefore, we do not address it. *See State v. Pinder,* 2005 UT 15, ¶ 45, 114 P.3d 551 ("Under ordinary circumstances, we will not consider an issue brought for the first time on appeal unless the trial court committed plain error or exceptional circumstances exist." (quotations and citation omitted)). However, because Defendant asserts these facts in his ineffective assistance of counsel claim, we will address them under that rubric.

## ANALYSIS

### I. Admission of Rule 404(b) Evidence

¶ 24 On appeal, Defendant argues that the trial court erroneously admitted evidence of domestic violence under rule 404(b) of the Utah Rules of Evidence. *See* Utah R. Evid. 404(b). According to rule 404(b),

[e]vidence of other crimes, wrongs[,] or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial.

*Id.*

¶ 25 As a threshold matter, once a defendant has requested notice of any rule 404(b) evidence the state intends to call at trial, the state must provide general notice of such evidence. *See id.* Defendant argues on appeal that after requesting notice of any potential rule 404(b) evidence, he did not receive the required notice. *See id.* Moreover, Defendant challenges the requirements for the admission of prior bad acts, arguing that rule 404(b) evidence was admitted for an improper purpose, *see id.,* and that it did not meet the requirements under rule 403, *see* Utah R. Evid. 403.

### A. Notice Requirement Under Rule 404(b)

¶ 26 Defendant argues that he did not receive proper pretrial notice of the domestic violence evidence introduced at trial. After reviewing the record, we conclude that Defendant never argued to the trial court that rule 404(b)'s notice requirements were not satisfied.

¶ 27 " '[A]s a general rule, claims not raised before the trial court may not be raised on appeal.' " *State v. Cram,* 2002 UT 37, ¶ 9, 46 P.3d 230 (quoting *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346). There are two policy reasons for this rule:

[F]irst, to give the trial court an opportunity to 'address the claimed error, and if appropriate, correct it,' and second, that 'a defendant should not be permitted to forego making an objection with the strategy of enhanc[ing] the defendant's chances of acquittal and then, if that strategy fails, ... claim[ing] on appeal that the [c]ourt should reverse.'

*Id.* at ¶ 10 (third, fourth, and fifth alterations in original) (quoting *Holgate,* 2000 UT 74 at ¶ 11). Therefore, "we decline to address this issue on appeal as it was never properly raised below." *Holmes Dev., L.L.C. v. Cook,* 2002 UT 38, ¶ 30, 48 P.3d 895.

**B. Additional Requirements under Rule 404(b)**

¶ 28 In his motion for a new trial, Defendant also argues that the trial court improperly admitted rule 404(b) domestic violence evidence.[4] "Evidence is admissible under rule 404(b) if '(1) the evidence is offered for a proper, noncharacter purpose, such as one of those listed in rule 404(b); (2) the evidence meets the requirements of rule 402; and (3) the evidence meets the requirements of rule 403.'" *State v. Devey,* 2006 UT App 219, ¶ 11, 138 P.3d 90. On appeal, Defendant argues that the first and third requirements of this test were not satisfied.

¶ 29 First, Defendant contends that the domestic violence evidence was improperly admitted as character evidence. Under rule 404(b), evidence of prior bad acts may only be admitted for noncharacter purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Utah R. Evid. 404(b). However, contrary to Defendant's assertions, "[t]his list [of noncharacter purposes] is not exhaustive, ... and evidence demonstrating other purposes is not precluded so long as the evidence is offered for a legitimate purpose other than to show the defendant's propensity to commit the crime charged." *State v. Allen,* 2005 UT 11, ¶ 17, 108 P.3d 730.

¶ 30 In *State v. Bates,* 784 P.2d 1126 (Utah 1989), the Utah Supreme Court found that evidence of prior bad acts is admissible under rule 404(b) to explain why a witness was initially reluctant to provide information to police. *See id.* at 1127–28. Specifically, the supreme court found that evidence of prior domestic violence "was not offered to show [the] defendant's propensity for violence, but was elicited to describe the ... reason [the victim] did not report ... incidents [of abuse] sooner." *Id.* at 1127. The evidence was used to show that the victim "was afraid of [the] defendant." *Id.; see also Washington v. Grant,* 83 Wash.App. 98, 920 P.2d 609, 613 (1996) (allowing the introduction of prior domestic violence evidence "to explain [the victim's] statements and conduct which might otherwise appear inconsistent with her testimony of the assault at issue in the present charge").

¶ 31 Similarly, in this case the trial court denied Defendant's motion for a new trial, concluding that the domestic violence evidence was admitted to explain Wife's "reluctance to initially reveal information about ... [D]efendant." At trial, Wife testified that she had initially made statements to the police that she "was not afraid of [Defendant] and that she believed he did not kill the boy" because she "was saying what [she] needed to say to survive." Therefore, we conclude that the trial court did not abuse its discretion in determining that the evidence of Defendant's domestic violence was admitted for a proper non-character purpose.

¶ 32 Second, Defendant argues that the rule 404(b) evidence of domestic violence was inadmissible because it did not meet the requirements of rule 403. *See Devey,* 2006 UT App 219 at ¶ 11 (stating that evidence of prior bad acts is only admissible under rule 404(b) if it "meets the requirements of rule 403"). Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed

---

4. Defendant did not object to the introduction of rule 404(b) evidence at trial. "However, [Defendant] did raise the issue in his motion for a new trial.... [Thus, although Defendant] did not raise the issue at the most appropriate time dur-ing the proceedings before the trial court, he did in fact raise the issue below; accordingly, we address his claim on its merits." *State v. Devey,* 2006 UT App 219, ¶ 11 n. 4, 138 P.3d 90.

by the danger of unfair prejudice." Utah R. Evid. 403. Defendant contends that although the evidence may be relevant to some extent, it is highly prejudicial.

¶ 33 In "determin[ing] whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice," the court must consider several factors. *State v. Allen*, 2005 UT 11, ¶ 24, 108 P.3d 730 (quotations and citations omitted). These include

> the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

*Id.* (internal citations and quotation marks omitted). Defendant argues that the evidence is highly prejudicial because of the similarities between the two crimes. The nature of the domestic violence incident involved Defendant choking Wife and hitting her pregnant stomach to force the miscarriage of the fetus. Because these actions are similar in nature to the crime with which Defendant was charged, we will assume that the jury would have inferred that Defendant had acted in conformity with his past violent behavior. Nevertheless, we conclude that there is enough evidence supporting Defendant's conviction that any error in admitting the 404(b) domestic violence evidence was harmless.

¶ 34 "[We] will not overturn a jury verdict for the admission of improper evidence if the admission of the evidence did not reasonably [a]ffect the likelihood of a different verdict." *State v. Houskeeper*, 2002 UT 118, ¶ 26, 62 P.3d 444. According to the evidence introduced at trial, Defendant admitted that he was at the Mosiers' apartment during the brief ten-minute period in which the murder likely occurred; two DNA tests confirmed that Christopher's blood was on one of the baby blankets; shortly after the murder, Defendant went to Hassan's apartment and spent an unusual amount of time in the bathroom; Defendant changed his clothes; Defendant carried his old clothes out in a bag; Defendant left a bar of soap in Hassan's apartment; a bar of soap was missing from the Mosiers' apartment; Defendant knew details of the crime that were not released to the public, including the approximate number of stab wounds Christopher suffered and that the striker plate on the door jamb was bent; Defendant also attempted to persuade his cellmate to fabricate a story designed to cast suspicion on individuals other than Defendant; and finally, Defendant gave police officers multiple inconsistent statements. Thus, given the strength of the evidence against Defendant, we conclude that any error in admitting the rule 404(b) evidence was harmless.

## II. Ineffective Assistance of Counsel

¶ 35 Defendant also asserts that he is entitled to a new trial because he received ineffective assistance of counsel at trial. To prevail on a claim for ineffective assistance of counsel, Defendant must show "(1) that counsel's performance was objectively deficient[ ], and (2) a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense.")).

¶ 36 Under the first prong of the test in *Strickland v. Washington, see* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Defendant argues that his trial counsel's performance was deficient for failing to (1) call a DNA expert for the defense, (2) thoroughly cross-examine the State's DNA expert, (3) object to certain comments the prosecutor made in closing arguments, (4) assert the marital privilege to exclude threats Defendant made to Wife, and (5) object to evidence of a domestic abuse incident admitted under rule 404(b).[5]

---

5. Defendant claims that he received ineffective assistance because his trial counsel failed to ob-

## A. Failure to Call a DNA Expert for the Defense

¶ 37 In his motion for a new trial, Defendant asserted that his trial counsel rendered ineffective assistance for failing to call a DNA expert. The trial court, however, denied Defendant's motion on grounds that counsel made a strategic decision not to call a DNA expert, after having previously consulted with one. We agree with the trial court.

¶ 38 In proving that trial counsel was ineffective, "[D]efendant must overcome the strong presumption that his trial counsel rendered adequate assistance, by persuading the court that there was no conceivable tactical basis for counsel's actions." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (alteration, emphasis, quotations, and citations omitted). "[T]actical decisions such as 'what witnesses to call, what objections to make, and, by and large, what defenses to interpose, are generally left to the professional judgment of counsel.'" *Adams v. State*, 2005 UT 62, ¶ 25, 123 P.3d 400 (quoting *State v. Wood*, 648 P.2d 71, 91 (Utah 1982)). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

¶ 39 Defense counsel's strategic decision not to call a DNA expert was reasonable. Although Defendant argues that his trial counsel's decision was not a legitimate strategic choice because the State's DNA expert testimony was unreliable, he cites nothing in the record that would demonstrate the unreliability of the State's expert. Instead, Defendant cites only to the affidavit of his own DNA expert, Dr. Johnson, filed in connection with Defendant's motion for remand under Utah Rule of Appellate Procedure 23B. *See* Utah R.App. P. 23B. The affidavit, however, is not part of the record on appeal, and we therefore do not consider it. *See State v.*

*Bredehoft*, 966 P.2d 285, 290 (Utah Ct.App. 1998) ("We consider affidavits supporting [r]ule 23B motions solely to determine the propriety of remanding ineffective assistance of counsel claims for evidentiary hearings."). Thus, because defense counsel's failure to call an expert DNA witness—after consulting with such a witness—was a reasonable strategic choice, we conclude that defense counsel did not render ineffective assistance by failing to call a DNA expert.

## B. Failure to Thoroughly Cross–Examine the State's DNA Expert

¶ 40 Defendant next argues that his trial counsel ineffectively cross-examined the State's DNA expert. However, Defendant fails to demonstrate that his counsel performed deficiently. Defendant cites to nothing in the record that would demonstrate his trial counsel's cross-examination of the State's DNA expert was deficient. Rather, Defendant again cites only to the rule 23B affidavit of his own DNA expert, Dr. Johnson. As we previously observed, such evidence is not part of the record on appeal and we do not consider it. *See id.* Consequently, Defendant fails to demonstrate his trial counsel's alleged deficient performance in this regard.

## C. Failure to Object to Statements Made in the Prosecutor's Closing Argument

¶ 41 Defendant also asserts that his trial counsel was ineffective for failing to object to certain comments the prosecutor made during closing arguments. Specifically, Defendant claims that his trial counsel should have objected when the prosecutor asserted in closing argument that the murder occurred within a ten-minute period and that Defendant is a liar.

¶ 42 A prosecutor commits misconduct during closing argument when the

---

ject to evidence that Defendant choked Wife with a belt and hit her in the stomach when she was pregnant. However, in Defendant's motion for a new trial, counsel objects to the admissibility of such evidence under rule 404(b). Therefore, because counsel did object to the domestic violence evidence in his motion for a new trial, we do not address this issue under Defendant's ineffective assistance of counsel claim. *See State v. Devey,*

2006 UT App 219, ¶ 11 n. 4, 138 P.3d 90 (noting that although the defendant did not object to the introduction of rule 404(b) evidence at trial, he did "raise the issue in his motion for a new trial" and therefore the issue was considered to be raised below). Instead, as previously addressed, we consider Defendant's claim regarding rule 404(b) evidence on the merits.

prosecutor's " 'actions or remarks ... call to the attention of the jury a matter it would not be justified in considering in determining its verdict.' " *State v. Bryant,* 965 P.2d 539, 550 (Utah Ct.App.1998) (quoting *State v. Cummins,* 839 P.2d 848, 852 (Utah Ct.App. 1992)). A prosecutor also engages in misconduct when "[the prosecutor] asserts personal knowledge of the facts in issue or expresses personal opinion, being 'a form of unsworn, unchecked testimony.' " *Id.* (quoting *State v. Parsons,* 781 P.2d 1275, 1284 (Utah 1989)). "However, '[c]ounsel for both sides have considerably more freedom in closing argument and a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom.' " *Id.* (quoting *Parsons,* 781 P.2d at 1284). Moreover, " '[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation.' " *Id.* (alteration in original) (quoting *United States v. Rivera,* 971 F.2d 876, 884 (2d Cir.1992)).

¶ 43 First, in closing argument, the prosecutor stated that Christopher's murder occurred within a ten-minute period. However, Defendant claims that there was a two-hour window in which the murder could have occurred. He reasons that the murder could have occurred anytime between 7:30 p.m., when Christopher's grandmother called him, and 9:30 p.m., when Mosier came home and found his body. However, Defendant fails to point out that trial counsel did, in fact, challenge the prosecutor's time line. In closing argument, defense counsel argued that the State's time line "is misleading." The record also indicates that throughout trial, defense counsel argued that the murder could have occurred at any time between the time Christopher talked to his grandmother on the phone at 7:30 p.m. and the time his mother found his body at 9:30 p.m. Defense counsel further pointed out the inconsistencies in Mosier's statements about the times she remembered calling Christopher the night he was killed. Because defense counsel challenged the State's time line for the murder, we conclude that counsel did not render ineffective assistance.

¶ 44 Moreover, the prosecutor's argument that the murder occurred within a ten-minute period was supported by the State's evidence. Christopher's grandmother testified that she called Christopher at 7:30 p.m. and spoke with him briefly. Mosier testified that she called Christopher at 7:45 p.m. and that Christopher did not answer. Therefore, we also conclude that the prosecutor's closing argument concerning the time line for the murder was not objectionable because it was supported by the evidence.

¶ 45 Regarding the prosecutor's comments calling Defendant a liar, courts are split on whether it is improper to characterize a defendant as a liar during closing arguments. Some jurisdictions have held that such argument is improper. *See Iowa v. Graves,* 668 N.W.2d 860, 876 (Iowa 2003) ("[I]t is improper for a prosecutor to call the defendant a liar, to state the defendant is lying, or to make similar disparaging comments."); *State v. Davis,* 275 Kan. 107, 61 P.3d 701, 710 (2003) ("It is improper for a prosecutor to accuse a defendant of lying."). Other jurisdictions disagree and have held that "referring to testimony as a lie is not *per se* prosecutorial misconduct." *Bland v. Sirmons,* 459 F.3d 999, 1025 (10th Cir.2006); *see also Massachusetts v. Coren,* 437 Mass. 723, 774 N.E.2d 623, 631 n. 9 (2002) (stating that "where the evidence clearly supports the inference that the defendant lied, the prosecutor may fairly comment on it"); *People v. Howard,* 226 Mich.App. 528, 575 N.W.2d 16, 28 (1997) (holding that a prosecutor may characterize the defendant as a liar if the comment is based on the evidence produced at trial). The Tenth Circuit has observed that it has previously "rejected claims of prosecutorial misconduct where the prosecution referred to a defendant as a liar on account of irreconcilable discrepancies between the defendant's testimony and other evidence in the case." *Bland,* 459 F.3d at 1025.

¶ 46 We assume, without deciding, that the prosecutor's statement that Defendant was a liar was improper and therefore Defendant's lawyer should have objected to those statements. However, we conclude that no prejudice resulted from this error because the

trial record is replete with Defendant's inconsistent statements.[6]

### D. Failure to Assert the Marital Privilege

■ ¶ 47 Finally, Defendant argues that his trial counsel was ineffective for failing to object to the admission of threatening statements Defendant made to Wife while they were married. Defendant asserts that his counsel should have objected on the grounds that the statements were inadmissible under Utah Rule of Evidence 502(b)(2) because they were confidential marital communications. *See* Utah R. Evid. 502(b)(2). Rule 502(b)(2) provides that

> [a]n individual has a privilege during the person's life to refuse to testify or to prevent his or her spouse or former spouse from testifying as to any confidential communication made by the individual to the spouse during their marriage and to prevent another from disclosing any such confidential communication.

*Id.* However, an exception to the spousal privilege exists for statements that are made, even in part, in furtherance of a crime or tort. *See* Utah R. Evid. 502(b)(4)(B).

¶ 48 Wife testified that she had occasionally given Defendant money from the petty cash where she worked, and that when the petty cash turned up missing one day, she suspected that Defendant had stolen it. When she confronted Defendant about the money, he told her that "he'd had people killed for less, or ... for saying things like that," and that he could put his fist through the back of [her] head." Wife also testified that Defendant threatened "that he would kill [their] son and that he would kill him in front [of her] just to make [her] suffer." Finally, Defendant told Wife that "he would be able to kill somebody and the police would never know it if they walked past him three minutes later[;] he would never show them any emotion about it."

¶ 49 Clearly, Defendant's statements to Wife are highly prejudicial because they present Defendant as a violent person capable of murder. Because these statements were made to Wife during their marriage, by the plain language of rule 502(b)(2), they fall into the category of marital communications. However, the rationale underlying the marital communication privilege is to " 'encourage marital confidences, which in turn promote marital harmony.' " *State v. Robertson,* 932 P.2d 1219, 1228–29 (Utah 1997) (quoting Utah R. Evid. 502 advisory committee's note), *overruled on other grounds by State v. Reyes,* 2005 UT 33, 116 P.3d 305, *and State v. Weeks,* 2002 UT 98, 61 P.3d 1000. Some jurisdictions have held that communications between spouses constituting threats and abuse promote marital disharmony and therefore cannot be considered "confidential communication[s]" within the meaning of the rule. Utah R. Evid. 502(b)(2). These jurisdictions have determined that such threatening and abusive communications do not fall within the marital communications privilege. *See Rubalcada v. Indiana,* 731 N.E.2d 1015, 1022 (Ind.2000) (holding that a husband's threat to do violence to his wife was not a privileged communication because it did not enhance the mutual trust and confidence of the marital relationship); *Louisiana v. Parent,* 836 So.2d 494, 504 (La.Ct.App.2002) (holding that marital privilege did not apply because "the litany of threats and abuse about which [the wife] testified did not include anything that could reasonably be considered a confidential communication"); *New York v. Mills,* 302 A.D.2d 141, 145, 750 N.Y.S.2d 230 (2002) (holding that given the purpose of the spousal privilege, it could not be invoked to exclude husband's statement, "I've killed before, and I'll do it again," made while physically and verbally threatening his wife); *Commonwealth v. Spetzer,* 572 Pa. 17, 813 A.2d 707, 719 (2002) (holding that the marital privilege yields when "the circumstances surrounding marital communications indicate that the communications are intended to create or further disharmony in the marital relationship"). Even so, we again assume, without deciding, that it was ineffective for counsel not to object to the admission of these statements. We nevertheless conclude that the admission of these statements did not affect the outcome of the trial be-

---

6. Furthermore, defense counsel's failure to object may have been based on the strategic decision to refer to one of the State's witnesses as a liar during the defense's closing argument.

cause of the heavy weight of evidence supporting Defendant's conviction, which we have previously outlined.

## CONCLUSION

¶ 50 Although we assume the trial court erred in admitting rule 404(b) domestic violence evidence, we conclude that such error was harmless given the weight of the evidence supporting Defendant's conviction. We further conclude that defense counsel was not deficient for failing to call its own DNA expert and for failing to thoroughly cross examine the State's DNA expert. Assuming, without deciding, that Defendant's counsel was deficient for failing to object to the prosecutor calling Defendant a liar during closing argument, we conclude that this assumed error was not prejudicial because there is ample record evidence of Defendant's inconsistent statements. Similarly, although we assume that defense counsel was deficient for failing to assert the marital privilege, we conclude that this assumed error did not prejudice Defendant at trial because of the weight of the evidence supporting Defendant's conviction.

¶ 51 Accordingly, we affirm.

¶ 52 I CONCUR: RUSSELL W. BENCH, Presiding Judge.

McHUGH, Judge (concurring):

¶ 53 The majority assumes, without deciding, that the trial court erred in denying Johnson's motion for a new trial because evidence of domestic abuse was admitted in violation of Utah Rule of Evidence 404(b) and that Johnson's counsel was ineffective for failing to invoke the marital privilege and for failing to object to the prosecutor's multiple references to Johnson as a liar during closing argument. Because my colleagues are convinced that these assumed errors are harmless in light of the strong evidence against Johnson, they nevertheless affirm the decision of the trial court.

¶ 54 Although I too would affirm the trial court, I cannot do so on a presumption that the cumulative effect of these assumed errors was harmless. *See State v. Kohl,* 2000 UT 35, ¶ 25, 999 P.2d 7 (quoting *State v. Dunn,* 850 P.2d 1201, 1229 (Utah 1993)) ("Under the cumulative error doctrine, we will reverse only if 'the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had.'" (alteration in original)). If I believed that the rule 404(b) testimony regarding Johnson's attempt to strangle his pregnant wife, the further testimony from Wife regarding damaging statements made by Johnson during the marriage, and the references to Johnson as a liar during the State's closing argument were all improperly admitted due to error or ineffective assistance of counsel, I could not conclude that the admission of this evidence was harmless. Therefore, I must consider whether evidence was improperly admitted or counsel was ineffective.

¶ 55 Johnson claims that his trial counsel was ineffective for failing to object to the State's references to Johnson as a liar during closing argument. "We have recognized a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Cruz,* 2005 UT 45, ¶ 38, 122 P.3d 543 (quoting *Myers v. State,* 2004 UT 31, ¶ 20, 94 P.3d 211). Under the facts of this case, where defense counsel also referred to one of the State's witnesses as a liar during closing argument, I would hold that Johnson has not overcome this presumption.

¶ 56 Johnson also argues that his trial counsel was ineffective for failing to assert the marital privilege to prevent Wife from testifying about statements made by Johnson. The State argues that the marital privilege is inapplicable both because the statements were made during the commission of a tort and because the purpose of the privilege would not be served by its application here. As the majority opinion explains, this is an issue of first impression in Utah, other jurisdictions are not in agreement on the question, and it is not at all certain whether an objection would have been successful. Thus, trial counsel's decision not to object may have been for strategic reasons. *See State v. Gonzales,* 2005 UT 72, ¶ 72, 125 P.3d 878 ("Because [trial counsel] may have felt that the objection was futile and chose not to object for strategic reasons (such as not

drawing attention to this unfortunate information), we will not question her strategy."). Consequently, I would hold that Johnson has not established that trial counsel was ineffective either for failing to object during closing argument or for failing to assert the marital privilege.

¶ 57 Under this analysis, the only remaining issue is whether the admission of the testimony about Johnson's attempt to strangle his pregnant wife while striking her in the stomach and threatening to harm the unborn child was more prejudicial than probative. *See* Utah R. Evid. 404(b). Presuming that Johnson is correct and the evidence should not have been admitted, when considered alone rather than cumulatively with the allegations of ineffective assistance of counsel, I agree that any error was harmless. *See Gonzales*, 2005 UT 72 at ¶ 74 ("If the claims are found on appeal to not constitute error ... the [cumulative error] doctrine will not be applied."). In doing so, I look to the totality of the evidence which is set forth in detail by the majority. *See State v. Hales*, 2007 UT 14, ¶ 86, 152 P.3d 321 (noting that when considering the effect of the error, the court considers the totality of the evidence).