2008 UT App 139

**STATE of Utah, Plaintiff and Appellee,**

v.

**Karl P. OTTERSON, Defendant and Appellant.**

**No. 20061080–CA.**

Court of Appeals of Utah.

April 17, 2008.

Dana M. Facemyer, Provo, for Appellant.

Mark L. Shurtleff, atty. gen., and Ryan D. Tenney, asst. atty. gen., Salt Lake City, for Appellee.

Before THORNE, Associate P.J., BILLINGS and DAVIS, JJ.

OPINION

DAVIS, Judge.

¶ 1 Karl P. Otterson challenges his conviction for solicitation to commit aggravated murder, arguing that the trial court committed numerous errors. We affirm.

BACKGROUND

¶ 2 On October 29, 2004, the State charged Otterson with four counts of forcible sexual abuse of a child, two counts of obstruction of justice, and one count of attempted sexual exploitation of a minor. Two months later, the State charged Otterson with three counts of sodomy on a child and four counts of aggravated sexual abuse of a child. While awaiting trial, Otterson participated in treatment programs inside the Utah County Jail. Due to these programs, Otterson was inspired to write a letter to his wife confessing not only to the alleged crimes, but also to other acts of sexual abuse of minors that were, until then, unknown. After seeing the letter during a visit to the jail, Otterson's wife alerted jail personnel so they could take the letter from Otterson.

¶ 3 As a result of reading the confiscated confession letter, prosecutor David Sturgill offered to allow Otterson to plead guilty to several of the charged crimes in exchange for the State dropping the remaining charges and agreeing not to file additional charges against Otterson regarding the other crimes he had identified in the letter. Otterson pleaded guilty on July 12, 2005. Otterson's sentencing hearing was scheduled for September 13, 2005.

¶ 4 While awaiting sentencing, Otterson approached fellow inmate Robert Watson and asked him for help finding a hitman to kill Sturgill. Another inmate, James Hill, overheard the conversations and brought them to the attention of jail officers. Hill was instructed to continue to listen in on Otterson and Watson's discussions about hiring a hitman. Instead, Hill offered to help Otterson in this endeavor, and Otterson began to talk with Hill directly about killing Sturgill. Hill overheard Otterson calling his

mother to locate sufficient funds to pay a hitman. Later, Watson also approached jail officers to tell them of Otterson's plans.

¶ 5 Jail officials gave Hill a description of an undercover police officer and instructed him to tell Otterson that the officer was a hitman named Mark who would be in town briefly and had agreed to meet with Otterson. The undercover police officer met with Otterson on August 29, 2005, in the visitor's section of the jail. Fearful of being overheard, Otterson insisted on communicating via written notes pressed up against the glass. Otterson asked the officer to "take care of Dave Sturgill" for $1,000 up front and $4,500 after Otterson was out of jail, and told the officer if he "need[ed] a gun, buy one."

¶ 6 The next day, Otterson told his mother to give Mark the money. When an officer posing as Mark's girlfriend arrived at Otterson's mother's home the next day, Otterson's mother gave the officer a manila envelope filled with cash. On September 1, 2005, Otterson told Hill that he wanted to watch the news on television to see if "anything had taken place yet."

¶ 7 Corrections officials decided to separate Otterson, Hill, and Watson from each other and to interview Otterson. After the interview regarding his pending case, Otterson asked for a second interview during which he asked the interviewing officer "if anybody was hurt." The officer thought this was odd because he had "never talked about anybody being hurt" during either interview with Otterson.

¶ 8 Otterson was subsequently charged with one count of solicitation to commit aggravated murder. At trial, Otterson claimed that Hill was lying and that Hill had only been helping him to transfer into a treatment program. To cast doubt on Hill's testimony, Otterson sought to admit the testimony of inmate Richard Cummings. Otterson's counsel proffered that Cummings would testify that Hill would "cheek" his prescription medications and sell them to other inmates, that Hill instructed other inmates on how to testify at competency hearings, and that Hill was known in jail as a snitch. The State objected, arguing that Cummings's testimony was largely irrelevant. The trial court ruled that

Cummings would be allowed to testify to Hill's reputation for snitching, but also ruled that testimony regarding Hill's incompetency "coaching," as well as medication "cheeking" and selling was excluded. Due to the trial court's ruling, and to the parties not wanting to bring the jury back for a fourth day, as well as in light of Otterson testimony regarding Hill, Otterson's attorney ultimately never called Cummings to the stand.

¶ 9 Otterson also sought to admit his confession letter into evidence. After excusing the jury, the trial court heard arguments regarding the letter and ruled against its admission, stating, "I believe [the letter] is prejudicial and is not relevant and I think that it does not aid the jury...."

¶ 10 During Otterson's testimony, he described a hearing before Judge Lynn Davis in October 2002, claiming that Judge Davis "chewed out [Otterson's probation officer] and Dave Sturgill for bringing this [probation violation hearing] to the [c]ourt [and] wasting the [c]ourt's time, ... and that [Judge Davis] saw no reason for [Otterson] to even be in court because [he] had not done anything wrong." Because Otterson's description of the hearing in his testimony sounded familiar to the trial court, a court clerk pulled the requisite file that confirmed the trial court's suspicion: The trial court judge himself, not Judge Davis, had presided over the hearing. The file also revealed that Sturgill was not involved in the hearing; the hearing was not an Order to Show Cause but rather a review filed by Adult Probation and Parole because Otterson had requested to move in with his wife who had a teenage stepdaughter; and the trial court judge had in fact ruled in favor of the State by denying Otterson permission to move in due to his parole requirement not to live with females under the age of eighteen. "So," the trial court concluded, "there then is the responsibility of this [trial c]ourt to rectify the problem, to see that the jury is not left with [ ] testimony ... that is incorrect. And that's where we are."

¶ 11 Otterson's counsel then proposed to the trial court two ways of addressing his client's testimony: "[T]o reiterate the [trial

c]ourt's understanding of the file to the jury" or, "in the alternative, to allow [the State] to raise those issues with [Otterson] on the stand and to point out the inconsistencies based on the record that is supplied in the file." Otterson's counsel reiterated that he would be "fine with ... whichever the [trial c]ourt or [the State] prefer[s]." The prosecutor then argued that it would be best for the trial court to correct the record himself, and the judge agreed.

¶ 12 During closing arguments, Otterson's counsel said:

> [Jury Instruction number 15] says ["]proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in the world that we know with absolute certainty.["] I don't know if I believe that, I know a lot of things that are for certain. I'm wearing a watch, but they put [that language] in [the jury instruction].

In response, the trial court instructed the jury that "counsel are not permitted to advise you whether they agree or disagree with [the law].... I don't know who 'they' is, but .... you are obligated to follow the instructions. So the comments were inappropriate." The prosecutor in his closing argument claimed, "[W]e know Mr. Otterson is not to be believed.... How do we know that? Because he sat right there, took an oath and he didn't tell the truth." The prosecutor went on to catalogue the various times that Otterson "lied," including the testimony that was contradicted by the trial court's statements to the jury.

¶ 13 The jury ultimately convicted Otterson of one count of solicitation to commit aggravated murder. Otterson now appeals.

---

1. "Under the plain error standard, we may reverse the district court on an issue not properly preserved for appeal when a party can show the following: '[1][a]n error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful....' " *State v. Powell,* 2007 UT 9, ¶ 18, 154 P.3d 788 (alterations and omission in original) (quoting *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993)).

2. The trial court informed the attorneys that a juror had a vacation planned that he would not

## ISSUES AND STANDARDS OF REVIEW

¶ 14 Otterson argues that the trial court erred by limiting Cummings's testimony. Otterson also argues that the trial court erred in denying the admission of his confession letter into evidence. " '[T]rial courts have wide discretion in determining relevance, probative value, and prejudice. In general, this court will not reverse the trial court's ruling on evidentiary issues unless it is manifest that the trial court so abused its discretion that there is a likelihood that injustice resulted.' " *State v. Valdez,* 2006 UT App 290, ¶ 7, 141 P.3d 614 (quoting *State v. Gomez,* 2002 UT 120, ¶ 12, 63 P.3d 72).

¶ 15 Otterson next claims cumulative error from the following: (1) the trial court's correction, in front of the jury, of Otterson's erroneous testimony about the court's prior rulings; (2) the trial court's correction of Otterson's counsel's statements regarding the reasonable doubt jury instruction; and (3) the prosecutor's statements in closing argument regarding Otterson's truthfulness. "Because [Otterson] did not properly preserve his ... claims of error with respect to his cumulative error claim at trial, we review them under the plain error standard." *State v. Powell,* 2007 UT 9, ¶ 13, 154 P.3d 788 (citing *State v. Dunn,* 850 P.2d 1201, 1208 (Utah 1993)).[1]

## ANALYSIS

### I. Limitation on Cummings's Testimony

¶ 16 Otterson argues that by limiting Cummings's testimony, the trial court improperly hampered Otterson's ability to impugn Hill's testimony against him. Even if we were to assume that the court's initial decision to limit Cummings's testimony was the sole reason Cummings was not called to the stand,[2] we "would still face the question

---

be able to cancel and that the attorneys could choose either to continue without that juror or to finish the case at a later date after the juror returned. When asked how he wanted to proceed, Otterson's counsel stated that Cummings "doesn't need to be on the stand today." And after the trial court told Otterson, "I'm not saying you have to forego Mr. Cummings. You can do what you want to do with Mr. Cummings," Otterson's counsel replied,

of harmless error." *See Luce v. United States,* 469 U.S. 38, 42, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). "[H]armless error is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *State v. Evans,* 2001 UT 22, ¶ 20, 20 P.3d 888.

¶ 17 The primary limitation on Cummings's testimony was that he not refer to Hill's medication "cheeking" and sales. However, Otterson himself testified, "[Hill] would sit on his bed, rock back and forth, and sometimes start to cry for no reason.... I knew that he was on medication." Otterson also testified that Hill "would sometimes say that he was hearing voices in his head to tell him to do different things." Taken together with Otterson's counsel's view of the superfluousness of Cummings's testimony, we agree with the State that no harm occurred from the limitation of Cummings's testimony to the extent that the jury heard Otterson's intended message: Hill's testimony was not to be trusted due to his state of mental health. Thus, Otterson was able to effectively place into evidence the trial court's chief limitation on Cummings's proffered testimony.

¶ 18 Moreover, the alleged error is harmless in light of the ample evidence beyond Hill's testimony that supported Otterson's conviction: Watson's testimony—which conformed to Hill's—regarding Otterson's desire and attempts to solicit a hitman to murder Sturgill; the undercover officer's testimony that Otterson asked him to "take care of Dave Sturgill" for $1,000 up front and $4,500 after Otterson was out of jail; and testimony of another undercover officer that she received cash from Otterson's mother to cover a "hit."

## II. Exclusion of the Confession Letter

 ¶ 19 Otterson next claims that the trial court erred in excluding his May 2005 confession letter. "Where evidence is ex-

[W]e're okay with not putting Mr. Cummings on the stand. I think his questions are small—are short—and the impact to the jury, I think we're comfortable in saying we are willing to forego Mr. Cummings's testimony.... And so I think with that knowledge before us today, we're okay with [Cummings not testifying].

cluded by the trial court and the substance of such evidence is later admitted through some other means, any error which may have resulted is cured." *State v. Colwell,* 2000 UT 8, ¶ 29, 994 P.2d 177. Thus, we "need not determine whether the proffered [evidence]" was improperly excluded, where "the substance of such [evidence] was later received through another source." *State v. Stephens,* 667 P.2d 586, 588 (Utah 1983); *see also State v. Sorensen,* 617 P.2d 333, 337–38 (Utah 1980) ("The initial exclusion of [the] evidence was ... error. Whatever error resulted therefrom was cured, however, by testimony offered and received at a later point [in the trial].... In short, [the] defendant had the benefit of the evidence which at one point was excluded but was later admitted." (footnote omitted)); *State v. Salmon,* 612 P.2d 366, 369 (Utah 1980) ("The testimony was therefore improperly excluded.... Nevertheless, in light of other testimony given at trial, the error in excluding the testimony was not prejudicial to [the] defendants.").

¶ 20 Although it is not clear to us why Otterson believes his confession to numerous other sexual crimes cuts in his favor,[3] he testified obliquely to the contents of the letter and the trial court informed the jury that the letter was "a complete confession ... concerning the sex crimes and violations to which [Otterson] has previously been convicted" as well as "a complete statement of anything and everybody he's done [harm to] ... in the past." Further, Otterson's counsel referred to the contents of the letter in his closing argument. Thus, both the closing argument and the trial court's observation squarely addressed Otterson's objective in seeking admission of the letter itself. Therefore, even if it were error to exclude the letter, we see no prejudice under the facts of this case.

3. The existence of the confession letter, which was brought to the attention of the jury, addressed Otterson's theory at trial that he lacked the intent to solicit someone to murder Sturgill. By contrast, the content of the letter included the names of Otterson's minor victims as well as graphic detail of Otterson's acts of sexual abuse, none of which Otterson ever sought to redact.

### III. Cumulative Error

¶ 21 Otterson claims that, taken together, (1) the trial court's correction of Otterson's erroneous testimony, (2) the trial court's correction of Otterson's counsel's statements regarding the reasonable doubt jury instruction, and (3) the prosecutor's statements during closing argument regarding Otterson's veracity, constitute cumulative error. Otterson failed to object to any of these alleged errors, requiring us to "review them under the plain error standard." *State v. Powell*, 2007 UT 9, ¶ 13, 154 P.3d 788. We therefore analyze Otterson's claim of cumulative error to determine whether an error exists, whether the error should have been obvious to the trial court, and whether the error was harmful. *See id.* ¶ 18.

¶ 22 First, rather than objecting to the trial court's ruling that it was "the responsibility of th[e c]ourt to rectify the problem" of Otterson's erroneous testimony, Otterson's counsel instead suggested that one remedy would be for the trial court to correct Otterson's false testimony. "Our invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *State v. Winfield*, 2006 UT 4, ¶ 15, 128 P.3d 1171 (internal quotation marks omitted). *See generally Pratt v. Nelson*, 2007 UT 41, ¶¶ 17–22, 164 P.3d 366 (discussing rationale and application of the invited error doctrine).

¶ 23 Second, as to Otterson's counsel's statement regarding the reasonable doubt jury instruction, "[o]bjections to written instructions shall be made before the instructions are given to the jury." Utah R.Crim. P. 19(e). But rather than making an objection to the reasonable doubt instruction outside the hearing of the jury, Otterson's counsel stated in his closing argument, "I don't know if I believe that [there are very few things in the world that we know with absolute certainty]." This statement amounts to a contradiction of the instruction, not an argument based thereon. The reasonable doubt instruction the trial court gave—and that Otterson's counsel attempted to modify during closing argument—is the jury instruction on reasonable doubt that the Utah Su-

preme Court has explicitly sanctioned. *See State v. Reyes*, 2005 UT 33, ¶¶ 37–38, 116 P.3d 305 (evaluating and approving the verbatim reasonable doubt jury instruction). Thus, there was no error here when the trial court corrected Otterson's counsel's statements.

¶ 24 Third, while it may have been an error for the State to call Otterson a liar, *see State v. Johnson*, 2007 UT App 184, ¶¶ 42–46, 163 P.3d 695, *cert. denied*, No. 20070608, 186 P.3d 347, 2007 Utah LEXIS 232 (Utah Nov. 13, 2007), such error was harmless. Even if "[w]e assume, without deciding, that the prosecutor's statement that [Otterson] was a liar was improper and therefore [Otterson]'s lawyer should have objected to those statements," we conclude that "no prejudice resulted from this error because the trial record is replete with [Otterson]'s inconsistent statements." *See id.* ¶ 46.

¶ 25 In sum, we will only reverse under the cumulative error doctrine "if the cumulative effect of the several errors undermines our confidence" that Otterson had a fair trial. *State v. Gonzales*, 2005 UT 72, ¶ 74, 125 P.3d 878 (omission, citation, and internal quotation marks omitted). "If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." *Id.* Of the three alleged errors, the first was—at best—an invited error, the second was not error, and the third was harmless error. *See State v. Powell*, 2007 UT 9, ¶ 13, 154 P.3d 788.

### CONCLUSION

¶ 26 We determine that any abuse of discretion in the trial court's limitation of Cummings's testimony, if error, was harmless. We see no prejudice resulting from the trial court's exclusion of the confession letter because the jury had heard testimony and comments regarding the letter's relevant contents. Finally, we reject Otterson's claims of cumulative error because Otterson failed to meet his burden under the plain error analysis to show that the alleged errors were in fact errors and that they would have changed the outcome of the trial. Affirmed.

¶ 27 I CONCUR: JUDITH M. BILLINGS, Judge.

¶ 28 I CONCUR IN THE RESULT: WILLIAM A. THORNE JR., Associate Presiding Judge.